**Dorothy STEVENS, Plaintiff–Appellant,**

v.

**Dorothy Wright TILLMAN, et al.,
Defendants–Appellees.**

Nos. 87–1031, 87–1200.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1987.

Decided Aug. 18, 1988.

Ronald H. Balson, Law Office of Ronald H. Balson, Chicago, for plaintiff-appellant.

Edward W. Feldman, Northwestern University Law Clinic, Chicago, for defendants-appellees.

Before CUMMINGS, COFFEY, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Dorothy Stevens was the principal of Mollison Elementary School in Chicago between 1962, when it opened, and 1981. Her career at Mollison ended unpleasantly. In December 1980 Dorothy Tillman was elected president of the Mollison School Local Advisory Council, a parent-teacher association sponsored by Chicago's Board of Education. Tillman launched the Council on a crusade to remove Stevens as principal. Tillman and supporters occupied Stevens's office at the school for three days running and served her with an "eviction notice"; they organized a boycott that (they claimed) kept more than 80% of the students out of school; they distributed handbills, picketed the school, and delivered tirades against Stevens at meetings of the Board of Education. In the spring of 1981 Stevens took five months' paid leave and was replaced as principal by Edith Dervin, whereupon the Local Advisory Council declared victory. When she returned to Chicago from her recuperation in Florida, Stevens was posted to another elementary school as principal. Tillman, by then a well-known figure, was elected to Chicago's City Council; Stevens retired at age 65 in 1985.

This case presents a claim under 42 U.S.C. § 1985(3) and two pendent claims under state law, defamation being the leading one. We shall need to decide some difficult questions concerning the difference between "facts" and "opinions" in the law of defamation and the scope of liability under § 1985(3) for conspiracies that violate state but not federal law.

I

The sit-in was illegal as trespass, and the boycott was a violation of the state's mandatory-attendance laws. Although the police arrested the parents for trespass in order to clear Stevens's office, the state's attorney chose not to prosecute them, and Stevens is not entitled to enforce these laws herself. The sit-in, during which Stevens was placed in fear for her person, was most likely an assault under Illinois law. An episode in which Tillman, backed by a crowd, shouted "Get her out of here or we are going to come and get her. We are going to come and get her ourselves" would put many a person in fear. For reasons she has kept to herself, Stevens chose not to complain about this; instead she filed suit under 42 U.S.C. § 1985(3). Stevens is white. Tillman and her aides, like almost all of the students at Mollison, are black, as is Edith Dervin. Stevens contends that Tillman campaigned to get rid of her on the basis of race, which Stevens believes violates § 1985(3) because in the process Tillman violated rights secured by state law. Tillman insists, to the contrary, that Stevens was dictatorial, condescending, and ineffectual; defects in her performance, and not her race, were the basis of the campaign against her. This attack on Stevens's fitness for her position led Stevens to present two state-law claims under the court's pendent jurisdiction: defamation and inducement to breach of contract.

During the pretrial proceedings, the district court held that all three claims presented triable issues. 568 F.Supp. 289 (N.D.Ill.1983), modified in part by order of November 2, 1984. The § 1985(3) claim is sufficient, the court believed, because it alleges that the defendants (Tillman and other members of the Local Advisory Council) conspired on racial grounds to influence the Board of Education, a governmental body. The libel and inducement claims, the court thought, depend on factual issues that only a jury may resolve. Before the trial got under way, the case was assigned to another judge, who took a different view of things.

After Stevens had presented her case to the jury, the court granted judgment for the defendants on the inducement count

under Fed.R.Civ.P. 50(a), finding that the Board of Education had not broken its contract with Stevens, so that the defendants could not be liable for inducing a breach. 661 F.Supp. 702, 712–13 (N.D.Ill.1986). The court pared back the number of statements the jury would be allowed to consider under the defamation claim, holding that some were not clearly "of and concerning" Stevens and that most of the others to which Stevens objected are constitutionally protected as opinion. *Id.* at 708–11. And although the court allowed the trial of the § 1985(3) claim to continue, *id.* at 705–07, it concluded that only proof of violent or unlawful acts would be sufficient to make out a case; to the extent the § 1985(3) claim rested on public statements and lobbying, the constitutional right to petition the government for redress of grievances prevented liability. Even this allowance was withdrawn at the end of the defendants' case, when the court dismissed the § 1985(3) claim after concluding that Stevens had not been deprived of a federally-protected right.

Nine potentially-defamatory statements went to the jury, which was instructed that it could return a verdict for Stevens only if it concluded that the statement is false and that clear and convincing evidence shows that the speaker knew the statement to be false or acted with reckless disregard for the truth. The jury returned special verdicts answering, statement-by-statement, whether the speech is false; if it is, whether clear and convincing evidence showed that the defendant knew of its falsity or was reckless; if it is false and the speaker acted with the necessary scienter, whether Stevens suffered damages; and, if so, the damages attributable to that statement.

The jury found that at a public meeting of the Board of Education, Tillman made these false statements:

> [O]ne child [in the entire school, covering grades K–8] was doing math at a sixth grade level and he was an eighth grade student, and the rest was below.
> She [Stevens] called all the parents a bunch of welfare mothers, a bunch of welfare children.

> [O]ne reason we were able to have an eighty-five to ninety percent effective boycott is because nine out of ten mothers in that school have been told by Miss Stevens that their child needs psychological, not to mention some of the other things that she told them.
> We have teachers put in the wrong places. That's one of the reason our children are not learning.

The jury also found that Tillman and six other members of the Local Advisory Council prepared and circulated a handbill containing these false statements:

> Her testing system was not working, yet she would not change it.
> The results are: only one child doing math on sixth grade level; and the majority of students are reading below grade level.

The evidence showed that 93% of Mollison's students were reading below their expected level—worse than the norm in Chicago for schools in poor neighborhoods—but not that only one student in the school was up to 6th grade level in math. Although the jury found that these six statements are false, it also answered the question "do you find that there is clear and convincing evidence that the defendant knew the statement to be false when made or acted with reckless disregard for the truth when making that statement?" with "No" for all six.

The judge gave the jury two other statements from the handbill:

> As of today, only half of the students have been tested this year for their levels.
> Miss Stevens told several reporters that most of Mollison's parents are on ADC.

The jury found that these statements are true. This left one statement, which Tillman made at the Board of Education's meeting:

> The teachers are afraid of her.... They are afraid of Miss Stevens. They have called me one by one and said, "You're absolutely right. We know what's going on, but if we speak up, she will write us up and we will be—then we'll get dismissed from the school."

The jury found that this statement is false and that Tillman either knew it is false or acted with reckless disregard for the truth when making it. (Perhaps the jury deemed it significant that not a single teacher at Mollison testified on the defendants' behalf at trial.) The jury also found that Stevens "suffered damages as a direct and proximate result of" the statement. It fixed these damages at $1.00.

Stevens contends on appeal that the jury, having found liability, was required to set damages at $1 million rather than $1.00. This is fanciful. It may be, as Stevens says, that she was humiliated by the campaign, suffered illness as a result of the vilification, and was led to retire earlier than she had planned to do because no other school held for her the attraction of Mollison, which she had helped to found. Still, a single statement in the course of an organized protest movement has almost no effect; a jury trying to value the damages attributable to this statement, on the assumption that everything else that transpired is lawful, had little choice but to return the customary figure of $1.00 as nominal damages. Stevens fares no better on the claim of tortious interference with contract. We agree with the district court that the Board did not break its contract with Stevens, see 661 F.Supp. at 712–13, which dooms this claim; we discuss it no further. Stevens argues weakly that the district judge erred by granting a two-month continuance in mid-trial during the illness of one of defendants' lawyers; such matters are committed to the court's discretion. This leaves several contentions, however, each entailing multiple legal issues. Stevens insists that all of the statements should have been submitted to the jury; that she did not have to prove scienter by clear-and-convincing evidence (or at all); and that the defendants violated § 1985(3).

Stevens has filed two notices of appeal. No. 87–1031 was filed in mid-trial and challenges the grant of judgment on the interference-with-contract claim at the end of plaintiff's case. No. 87–1200 was filed on entry of the final judgment. We dismiss No. 87–1031 as premature; No. 87–1200, however, brings up the entire case.

## II

The district court granted judgment for defendants as a matter of law on two categories of statements: those that did not mention Stevens by name, and those that the court characterized as opinion.

### A

■ Under Illinois law statements that reasonably may be read as referring to someone other than the plaintiff are not actionable. *Chapski v. Copley Press*, 92 Ill.2d 344, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982). The district court apparently believed that under Chapski only statements referring to the plaintiff by name are actionable. No Illinois case supports that proposition; insinuation can be as devastating as name-calling. See *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 267 (7th Cir.1983) (Illinois law). A statement that logically refers to a particular person may be actionable; *Chapski* held that "the words and the implications therefrom [should be] given their natural and obvious meaning" (442 N.E.2d at 200, 65 Ill. Dec. at 889), not that every possible inference is to be indulged in the speaker's favor. The first amendment does not contain a direct-reference requirement, *Saenz v. Playboy Enterprises, Inc.*, 841 F.2d 1309, 1313–17 (7th Cir.1988), so it is unnecessary to read Illinois law that way to avoid unconstitutionality.

■ Any error in this respect is harmless, however. Stevens's brief on appeal presses, as her best case of defamation by innuendo, statements Tillman made on December 17, 1980.

> We are having quite a few problems at Mollison.
> Only one student at Mollison was doing math at a sixth grade level. The rest are below.
> The children are endangered.
> Our children are not doing math.

Statements of this sort naturally may be read as slights on the principal. But the

first is an empty commentary rather than a statement of fact. (We discuss the "opinion" question more fully below.) The third is true: it refers to Mollison's practice of sending pupils home for lunch, even though the school's neighborhood is a rough one. Stevens contended that the collective bargaining agreement with the teachers' union required the school to be closed for lunch, while Tillman disagreed; in either case, no one doubted that the children were in more danger walking back and forth in the neighborhood than they would have been eating lunch at school. (Edith Dervin, who replaced Stevens, promptly instituted a "modified closed campus" system over the teachers' objection; other elementary schools in Chicago, operating under the same collective bargaining agreement, used a "closed campus" system.) The second statement in this group is essentially identical to one that the jury found false but not intentionally or recklessly so; another statement of the same character would have fetched the same result. The fourth is along the lines of the second but less specific; if the second is not actionable, neither is the fourth.

## B

■ Another, much larger, category of statements was removed from the jury's purview as "opinion". *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974), holds that the first amendment prohibits attaching civil liability to statements of opinion. Ever since, courts have wrestled with the question "what's an opinion?" and have come up with buckets full of factors to consider but no useful guidance on what to do when they look in opposite directions, as they always do. E.g., *Fudge v. Penthouse International, Ltd.*, 840 F.2d 1012, 1015–17 (1st Cir.1988); *Dunn v. Gannett New York Newspapers, Inc.*, 833 F.2d 446, 452–55 (3d Cir.1987); *Potomac Valve & Fitting Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1286–90 (4th Cir.1987); *Janklow v. Newsweek, Inc.*, 788 F.2d 1300 (8th Cir. 1986) (en banc); *Ollman v. Evans*, 750 F.2d 970, 979–84 (D.C.Cir.1983) (en banc) (plurality opinion). This is hardly a satis-

factory state of affairs. See Note, *The Fact–Opinion Determination in Defamation,* 1988 Colum.L.Rev. 809 (1988).

*Gertz* requires a court to separate "fact" from "opinion", a task we have carried out when necessary, see *Quilici v. Second Amendment Foundation,* 769 F.2d 414, 418–21 (7th Cir.1985); *Brown & Williamson Tobacco Corp. v. Jacobson,* 827 F.2d 1119, 1129 (7th Cir.1987), without producing a useful definition of "opinion". The parties press different views on us, but we resist the temptation to come up with a new and "better" definition, in part because fact cannot be separated from opinion by ever-more-elaborate definitions. Every statement of opinion contains or implies some proposition of fact, just as every statement of fact has or implies an evaluative component. Even the statement "I don't like the color blue" implies a proposition about the speaker's sensibilities; he could be lying about his own dislikes or mistaken in the sense that on further reflection he would say something different about the color blue. The statement "mauve is a lousy color" implies "I don't like mauve", with the same difficulties. The statement "socialism is better than capitalism", seemingly an opinion dependent on the speaker's preferences about control of productive assets, could be false in the sense that the speaker, who holds certain values, might conclude after reflection (and access to data) that capitalism serves his own values better than socialism does. Much modern political and ethical philosophy consists in efforts to demonstrate that statements about justice and other hard-to-pin-down terms may be reduced to less contentious statements that will be accepted (with their logical implications) in a way that produces agreement. Statements of "pure" opinion also may imply or depend on facts. One may say "Jones has a tin ear", implying something about his behavior that may be false. One may say "George Stigler did not deserve the Nobel Prize" because one believes that Frank Knight should have received it; but Knight died before Stigler received the prize, and on learning that there are no posthumous

Nobel Prizes this person too might favor Stigler. The statement "no one will ever build a heavier-than-air flying machine" is opinion in 1900 and false in 1905. The statement "Paul Morphy was a better composer than Wolfgang Amadeus Mozart" appears to be an egregiously erroneous statement of either opinion or fact—until you realize that the speaker must have meant "composer of chess puzzles". The statement "$2 + 3 = 5$", apparently one of "fact", implies something about the speaker's use of "$+$", particularly that he thinks "$+$" signifies addition, in base six (or higher). See Saul A. Kripke, **Wittgenstein on Rules and Private Language** 8–24 (1982), for a brief description of the many opinions and related beliefs underlying something as simple as the use of "$+$". It could be a statement about a very different kind of math—or maybe not a statement about any kind of math. Even axiomatic math cannot yield "factual" (logically true) statements about all interesting arithmetical relations, as Gödel and Turing established. See Ernest Nagel and James R. Newman, **Gödel's Proof** (1958); Gregory J. Chaitin, *Randomness in Arithmetic*, 259 Scientific American 80 (July 1988). The reason Fermat's Last Theorem remains unproven (and unrefuted) may be that it is neither true nor false—just an "opinion" about numbers.

Most efforts to separate "fact" from "opinion" start with the belief that a "fact" is something verifiable, while an opinion is not. The branch of philosophy known as logical positivism is built on the proposition than only what is verifiable is worth debating (more rigorously, that "there are no synthetic *a priori* statements except this one"), but it has fallen on hard times not only because no one can separate the "verifiable" from the "non-verifiable" (was the statement "there are craters on the other side of the moon" an opinion that turned to fact when we gained the ability to put satellites in orbit around the moon?), but also because most philosophers believe that there are useful ways to debate even non-verifiable statements. They may be derived from axioms (or from axiomatic arguments about the "state of nature"); if this treatment is impossible, their implied factual bases may be tested. Courts trying to find one formula to separate "fact" from "opinion" therefore are engaged in a snipe hunt, paralleling the debates between positivist and deontological thinkers in philosophy. Perhaps the Constitution requires the search for this endangered species, but more likely the difference between "fact" and "opinion" in constitutional law responds to the pressure the threat of civil liability would place on kinds of speech that are harmless or useful, not on the ability to draw a line that has vexed philosophers for centuries. See *Ollman*, 750 F.2d at 995–1001 (Bork, J., concurring). It is the cost of searching for "truth"—including the cost of error in condemning speech that is either harmless or in retrospect turns out to be useful, a cost both inevitable and high in our imprecise legal system—that justifies the constitutional rule. Like other attempts to compare things that can be neither quantified nor reduced to a common metric (how much does the value of free speech "weigh" compared with the value of reputational injury?), this will never yield a rule.

The potential for erroneous condemnation of harmless or beneficial speech should make courts reluctant to embrace unstructured, multi-factor "tests". For the first amendment is valuable only when the speech is threatening and unpopular—for only then would juries condemn speech in the absence of a constitutional rule. If the Constitution protects only moderate speech, it protects nothing. Supercharged rhetoric is part of many political debates, as is the careless and inaccurate accusation; these inevitably injure, yet speech must be protected even when it injures, lest the scope of debate be curtailed. *Hustler Magazine v. Falwell*, —— U.S. ——, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). A "balancing test" readily yields to the impulse to stamp out speech "just this one time" in order to punish a particularly crude and unjustified sally; the felt necessities of the day overwhelm the general principle, and a balancing test has no resource to prevent it. The case seems the exceptional one; and the jury—drawn from throughout

northern Illinois—may bring to the case sensibilities about "acceptable" speech very different from those prevailing in the Mollison school zone. The prospect of exceptions "for this day and train only" destroys the value of the rule, however. Before adopting a multi-factor approach we should consider, too, a powerful structural objection: the first amendment says that "Congress shall make no law ... abridging the freedom of speech", not that "Congress shall make no *unwise* law ...". The State of Illinois is not Congress, but the first amendment applies (through the fourteenth) just the same, and so far as the federal courts are concerned a rule of common law is no different from a statute. Our court has so far refrained from deciding how to go about identifying protected "opinions", see *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1129 n. 3 (7th Cir.1987), and we are not anxious to settle that question now, unless that is essential.

Before attempting to compare the incomparable, we need to ask whether Illinois would treat the statements in question as defamatory. The first inquiry in any "constitutional case" is whether there is any need to declaim on the meaning of the Constitution. Unless Illinois would treat Tillman's statements as actionable, there is no constitutional defense to consider. The district court assumed that only the first amendment stood between Tillman (and friends) and civil liability. Our reading of Illinois law is different; we do not think the statements characterized as "opinions" are actionable independent of the factual propositions they imply—propositions that were in fact submitted to the jury.

Here is a sample of the statements that the district court found constitutionally-protected as "opinions".

We found in our investigation that our principal must be removed.... Our principal is very insensitive to the needs of our community, which happens to be totally black. She made very racist statements during the boycott. She is a racist. She must go. We cannot have racist people around our children.... She made numbers of very racist statements, so many that I would use all of my time to explain to you some of the statements that were made.

Our children are afraid of her. I think discipline is fine. The child must respect the principal; he or she must respect the teachers. But I mean there is no sense —and our children feel as though they are on a plantation. And there is no reason in 1981 why we should have a principal making such racist statements. The teachers of the school have brought to most of our attention that it has been run as a dictatorship, and we do not need a dictatorship in our children's school.... They're being degraded and put down, and it's all because of a dictatorship with Miss Stevens.

We have exposed the Mollison pollution.... Since 1975, the quality of education has gone down at Mollison School and Miss Stevens has sat and watched it. She did nothing about it.... Miss Stevens is insensitive to the children, the parents and the community. We can no longer allow her to destroy our children's minds.

The common law in Illinois follows the **Restatement (Second) of Torts** § 566 (1977), which provides:

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

When a statement in the form of an opinion discloses the defamatory facts (or refers to facts in the public record), it is not actionable apart from those facts. See *Horowitz v. Baker*, 168 Ill.App.3d 603, 119 Ill.Dec. 711, 523 N.E.2d 179 (3d Dist.1988); *Stewart v. Chicago Title Insurance Co.*, 151 Ill.App.3d 888, 104 Ill.Dec. 865, 503 N.E.2d 580 (4th Dist.1987), both building on dicta in *Owen v. Carr*, 113 Ill.2d 273, 277–81, 100 Ill.Dec. 783, 787–88, 497 N.E.2d 1145, 1148–49 (1986). (In *Costello v. Capital Cities Communications, Inc.*, 153 Ill.App.3d 956, 966–67, 106 Ill.Dec. 154, 160–62, 505 N.E.2d 701, 707–09 (5th Dist.1987), a divided panel concluded that *Stewart* had misinterpreted

*Owen; Horowitz* followed *Stewart* without further discussion, and we are convinced that these cases are on solid ground.) *Horowitz* is particularly instructive, because the speech in question there made a number of derogatory statements ("sleazy", "cheap", "pull a fast one", "secret", and "rip-off") about the plaintiff's purchase of bricks from a city. These statements readily could have been read to imply the speaker's knowledge of bribery, extortion, or some other crime. The court nonetheless held them not actionable under state law, because a newspaper earlier had published the facts on which these characterizations had been based.

Tillman and her confederates disclosed the principal bases of their condemnations. The students were doing poorly at math; Stevens employed a method of testing that her witnesses at trial conceded was improper; the students were forced to walk home and back again at lunch; Stevens was a strict disciplinarian; Stevens thought poorly of the pupils ("welfare children") and their prospects (they needed "psychologicals"); and on and on. Most of these factual averments were submitted to the jury, which found several false but not intentionally so; others were found true (or were not pressed by Stevens). All that remained was the characterization, which under Illinois law is not actionable apart from the underlying statements of fact.

One subject was removed from the jury's purview without any (evident) submission of underlying fact: the repeated claim that Stevens is a "racist". This was offered as a body blow, an attack on fitness and integrity. Stevens argues that it is libel *per se* under Illinois law. Tillman also declared that Stevens "made numbers of very racist statements, so many that I would use all of my time to explain to you some of the statements that were made." Stevens either did or did not make repugnant statements; Tillman said that she had, yet offered no examples. One is entitled to wonder how such an assertion can be "opinion." Perhaps Tillman meant only to characterize statements of the "welfare-mother" variety; this interpretation would be an opinion rather than a declaration of fact.

The words also might have implied something like: "Stevens made to me statements similar to those that Gov. Ross Barnett made while standing in the schoolhouse door, and she holds the same views about black people that Barnett did." That would be a statement of fact, and could be quite wrong.

Curiously, Stevens does not contend that the jury should have been allowed to consider whether Tillman's oratory implied to listeners that Stevens had made the kind of statements that all ears find repellent. Stevens contends that the epithet "racist" is itself actionable because it marks her as unfit to be principal of a public school and because Tillman used the term (in conjunction with the claim that she had conducted an "investigation") to imply possession of derogatory information. The results of the "investigation", such as it was, were spread before the jury. We do not think a court of Illinois would agree that the term itself is actionable, so again we do not consider any constitutional argument.

Illinois has competing doctrines: first, that statements impugning one's professional competence are actionable without further proof of injury; second, that "mere name-calling" is not actionable. Compare *Costello v. Capital Cities Media, Inc.*, 111 Ill.App.3d 1009, 67 Ill.Dec. 721, 445 N.E.2d 13 (5th Dist.1982) ("lying leadership" is actionable per se), affirmed in relevant part after later appeal, 153 Ill.App.3d 956, 106 Ill.Dec. 154, 505 N.E.2d 701, 708 (1987); *Erickson v. Aetna Life & Casualty Co.*, 127 Ill.App.3d 753, 83 Ill.Dec. 72, 469 N.E.2d 679 (2d Dist.1984) (calling chiropractor's treatment "unreasonable & unnecessary" is actionable per se); with, e.g., *Horowitz* ("sleazy" and "rip-off" are name-calling); *Valentine v. North American Co. for Life & Health Insurance.*, 60 Ill.2d 168, 328 N.E.2d 265 (1974) ("lousy agent" is name-calling); and *Skolnick v. Nudelman*, 95 Ill.App.2d 293, 305, 237 N.E.2d 804, 810 (1st Dist.1968) ("nut", "mishuginer", and "screwball" are name-calling). We shall not pretend to be able to harmonize these cases. "Liar" and "unnecessary medical treatment" imply a greater degree of cer-

tainty than does "lousy agent" or "rip-off" and therefore, we suppose, imply access to additional supporting facts, but there is hardly a bright line. We do not think it necessary to wrestle with the subject in light of *Owen v. Carr*, the most recent word from the Supreme Court of Illinois, which held that "[l]anguage to be considered defamatory must be so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary." 497 N.E.2d at 1147, 100 Ill.Dec. at 785. *Owen* ruled that, as a matter of law, an accusation that an attorney filed a complaint "deliberately to intimidate" the defendants was not actionable, although the comment implied professional wrongdoing.

Accusations of "racism" no longer are "obviously and naturally harmful". The word has been watered down by overuse, becoming common coin in political discourse. Tillman called Stevens a racist; Stevens issued a press release calling Tillman a "racist" and her supporters "bigots". Formerly a "racist" was a believer in the superiority of one's own race, often a supporter of slavery or segregation, or a fomenter of hatred among the races. Stevens, the principal of a largely-black school in a large city, obviously does not believe that blacks should be enslaved or that Jim Crow should come to Illinois; no one would have inferred these things from the accusation. Politicians sometimes use the term much more loosely, as referring to anyone (not of the speaker's race) who opposes the speaker's political goals—on the "rationale" that the speaker espouses only what is good for the jurisdiction (or the audience), and since one's opponents have no cause to oppose what is beneficial, their opposition must be based on race. The term used this way means only: "He is neither for me nor of our race; and I invite you to vote your race." When Stevens called Tillman a "racist", Stevens was accusing Tillman of playing racial politics in this way rather than of believing in segregation or racial superiority. That may be an unfortunate brand of politics, but it also drains the term of its former, decidedly opprobrious, meaning. The term has ac-

quired intermediate meanings too. The speaker may use "she is a racist" to mean "she is condescending to me, which must be because of my race because there is no other reason to condescend"—a reaction that attaches racial connotations to what may be an inflated opinion of one's self—or to mean "she thinks all black mothers are on welfare, which is stereotypical". Meanings of this sort fit comfortably within the immunity for name-calling.

Language is subject to levelling forces. When a word acquires a strong meaning it becomes useful in rhetoric. A single word conveys a powerful image. When plantation owners held blacks in chattel slavery, when 100 years later governors declared "segregation now, segregation forever", everyone knew what a "racist" was. The strength of the image invites use. To obtain emotional impact, orators employed the term without the strong justification, shading its meaning just a little. So long as any part of the old meaning lingers, there is a tendency to invoke the word for its impact rather than to convey a precise meaning. We may regret that the language is losing the meaning of a word, especially when there is no ready substitute. But we serve in a court of law rather than of language and cannot insist that speakers cling to older meanings. In daily life "racist" is hurled about so indiscriminately that it is no more than a verbal slap in the face; the target can slap back (as Stevens did). It is not actionable unless it implies the existence of undisclosed, defamatory facts, and Stevens has not relied on any such implication.

### III

The district court instructed the jury that it could return a verdict for Stevens only if it found by clear and convincing evidence that any falsehood had been uttered with knowledge of the lie or recklessness toward the truth. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–86, 84 S.Ct. 710, 725–29, 11 L.Ed.2d 686 (1964). It did so on two grounds: that

Stevens is a public official, and that the speakers were exercising their right to petition the government for redress of grievances.

Stevens relies on *Hutchinson v. Proxmire*, 443 U.S. 111, 133–36, 99 S.Ct. 2675, 2687–89, 61 L.Ed.2d 411 (1979), for the proposition that public criticism does not transmute the target into a "public figure". Granted. But Stevens was a public *official*—just like the commissioner who supervised the police department in *New York Times v. Sullivan*—whether or not she was a public figure. Her performance as a public official was open to public comment. *Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–76, 15 L.Ed.2d 597 (1966). Stevens was not an elected public official, but as principal she possessed great discretion over the operation of Mollison School. How she used that discretion was the subject of legitimate public debate. Perhaps there should be a "limited-purpose public official" just as there is a "limited-purpose public figure", see *O'Donnell v. CBS, Inc.*, 782 F.2d 1414, 1417 (7th Cir.1986), for even senior bureaucrats such as Stevens should not be required to forego all privacy interests in order to render public service just because those running for public office do. If there be such a doctrine, however, it would not assist Stevens. The statements at issue here dealt with the way Stevens ran Mollison School, not with her private life.

Too, as the district court held, the statements in question either were made at meetings of the Board of Education or were part of a campaign to influence the Board. The statements made directly to the Board are governed by the *New York Times* standard under the holding of *McDonald v. Smith*, 472 U.S. 479, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985). Those made as part of the campaign to whip up public support in order to put pressure on the Board to remove Stevens are equally protected. See *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907–12, 102 S.Ct. 3409, 3422–25, 73 L.Ed.2d 1215 (1982); cf. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *Premier*

*Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 371–76 (7th Cir.1987). The first amendment prohibits efforts to ensure "laboratory conditions" in politics; speech rather than damages is the right response to distorted presentations and overblown rhetoric. A campaign to influence the Board of Education is classic political speech; it is direct involvement in governance, and only the most extraordinary showing would permit an award of damages on its account. The district court did not err in instructing the jury that only evidence satisfying the *New York Times* standard would permit an award of damages.

**IV**

■ We come at last to the claim under § 1985(3), which was the basis of federal jurisdiction in this case. The statute provides:

If two or more persons ... conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities ... from giving or securing to all persons ... the equal protection of the laws; ... the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

This statute addresses private acts—going "in disguise on the highway" is a reference to the M.O. of the Ku Klux Klan—yet condemns only deeds that "deprive" the victim of "the equal protection of the laws, or of equal privileges and immunities under the laws", something within the domain of government exclusively. This admixture of private and public action has befuddled courts ever since. See, e.g., *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Great American Federal Savings & Loan Ass'n v. Novot-*

*ny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); and *United Brotherhood of Carpenters v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983), the principal modern cases in a long chain that has included declarations of unconstitutionality, revivals, and reinterpretations. It is hard to come up with an enduring interpretation of such an opaque statute, when the Court tries on the one hand to avoid turning all state torts into federal offenses and on the other to give some content to a statute that if read naturally speaks only to state action and therefore duplicates § 1983.

As we understand the Supreme Court's contemporary cases, § 1985(3) reaches three kinds of conduct:

1. Racially-motivated private conspiracies to deprive persons of rights secured to all by federal law. (Whether any other motivation is covered, and whether federal "law" for this purpose is limited to the Constitution itself, are open questions.) *Griffin* is an example to the extent the conspiracy deprived the plaintiffs of their constitutional right to engage in interstate travel.

2. Racially-motivated private conspiracies to deprive persons of rights secured to all by state law, where the deprivation interferes with the exercise of a federally-protected right. A cross-burning (trespass and assault) by the Klan is an example to the extent the threat of violence induces the targets to refrain from exercising federally-assured rights, such as the rights to travel, to associate or speak, and to vote.

3. Racially-motivated conspiracies to deprive persons of rights secured only against governmental action (such as the right of free speech), provided the defendants are either "state actors" or seeking to influence the state to act in a prohibited way. *Scott,* 463 U.S. at 831–34, 103 S.Ct. at 3357–59; *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 828–30 (7th Cir.1975) (Stevens, J.).

The statute does not, however, create any of the rights at issue. *Novotny,* 442 U.S. at 372, 99 S.Ct. at 2349; *Scott,* 463 U.S. at 833, 103 S.Ct. at 3358. The plaintiff must locate a right independently secured by state or federal law and then show (if only state law is at issue) that the offense deprives him of a right secured by a federal rule designed for the protection of all. See also *Griffin,* 403 U.S. at 102–03, 91 S.Ct. at 1798–99, for other elements of the § 1985(3) tort.

Stevens does not argue that the defendants' efforts to induce the Board to get rid of her "aim[ed] at a deprivation of the equal enjoyment of rights secured by the law to all" (*Griffin,* 403 U.S. at 102, 91 S.Ct. at 1798). The standard federally-secured rights—to speak, worship, travel, and so on—are not at stake. Stevens' position as principal was put at risk, but neither state nor federal law creates a "property" interest in a principalship. The Board of Education was free to transfer Stevens if it chose, and under *Bigby v. City of Chicago,* 766 F.2d 1053 (7th Cir.1985), there is no independent federal right in having an especially desirable public job. There may well be a federal right in ability to practice the common occupations of the community, see *Truax v. Raich,* 239 U.S. 33, 38–42, 36 S.Ct. 7, 9–11, 60 L.Ed. 131 (1915); *Scott v. Village of Kewaskum,* 786 F.2d 338, 340 (7th Cir.1986), but that right was not in jeopardy. Moreover, Stevens does not contend that Tillman violated any of her rights under state law (such as the right to be free from assault) for the purpose or with the effect of inducing her to surrender or refrain from exercising rights secured by federal law.

The claim under method (3) is more plausible: Stevens argues that Tillman and supporters plotted to get rid of her on racial grounds; and although this is a right secured against state rather than private action, Stevens was trying to influence the Board of Education, a state actor. We very much doubt that § 1985(3) properly may be used to penalize racially-motivated political campaigns, any more than the antitrust laws may be used to penalize deceitful campaigns to obtain protection from competition. See *Noerr* and related cases

discussed in *Premier.* We need not pursue this, however, because the Board of Education took no action; Stevens did not suffer injury at official hands; since she was not "deprived" by the Board of any entitlement, she may not recover on the line of reasoning approved in *Scott.*

In the end, Stevens's injury was imposed directly by the private conduct of Tillman and associates—the sit-in, the verbal threats, the slander, and so on. Her argument is that § 1985(3) supplies a remedy for abuse heaped on someone on racial grounds, even if there is neither state action nor a deprivation of any federally-secured entitlement (other than the entitlement, employed here in a perfectly circular way, to be free of racially-motivated abuse). We must assume, given the posture of the case (judgment at the close of the evidence), that the jury would have inferred that Tillman had race on her mind when trying to get rid of Stevens. Still, no case in the Supreme Court has used § 1985(3) in this way, and only one appellate decision, *Life Insurance Co. of North America v. Reichardt,* 591 F.2d 499 (9th Cir.1979), has done so. *Reichardt* preceded both *Novotny* and *Scott* and is inconsistent with them, as well as with *Cohen* in this circuit. Among cases from the Supreme Court see, e.g., *Ex parte Yarborough,* 110 U.S. 651, 657, 4 S.Ct. 152, 154, 28 L.Ed. 274 (1884) (parallel criminal statute properly used to penalize private terror that affected the right to vote for a member of Congress); *United States v. Waddell,* 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884) (same statute used to penalize deprivation of homestead interest secured by federal law); *Logan v. United States,* 144 U.S. 263, 285, 12 S.Ct. 617, 623, 36 L.Ed. 429 (1892) (federal right of persons in federal custody to be free from attack); *United States v. Guest,* 383 U.S. 745, 755–60, 86 S.Ct. 1170, 1176–79, 16 L.Ed.2d 239 (1966) (federal statutory right to use public accommodations, plus constitutional right to travel); *Griffin* (right to travel). Many cases—all before *Griffin,* to be sure—say that without the federal "hook" § 1985(3) and cognate criminal laws do not provide relief for ordinary criminal assaults and

batteries, even if the aggressor acted with a racial motive. E.g., *Waddell,* 112 U.S. at 79–80, 5 S.Ct. at 86–87. *Reichardt,* the only modern departure from this understanding, has been ignored even in the Ninth Circuit. *Havas v. Thornton,* 609 F.2d 372, 374 (9th Cir.1979) (the plaintiff must show a deprivation of rights secured by the Constitution or federal law). But cf. *Abrams v. 11 Cornwell Co.,* 695 F.2d 34, 41–42 (2d Cir.1982) (pre-*Scott* case suggesting willingness to treat violation of state law alone as an adequate basis of a § 1985(3) claim).

This wheel will continue to turn. Changing interpretation has been the only constant about § 1985(3). See *Grimes v. Smith,* 776 F.2d 1359, 1363–1366 (7th Cir. 1985) (tracing the history); *Volk v. Coler,* 845 F.2d 1422, 1435 (7th Cir.1988) (as if to prove the point, disagreeing with *Grimes,* without discussing it, on the statute's coverage of non-racial, political conspiracies). Which way it will turn is anyone's guess. Strong arguments may be made for making all racially-motivated harms actionable—though whether this should be a federal tort is a legislative question. If Congress spoke to the subject through § 1985(3), it disguised its meaning well. We follow the accepted understanding of § 1985(3) without pretending to certainty that the understanding is right—either as an interpretation of the law or as a wise rule.

No doubt Stevens suffered injury at Tillman's hands. No doubt Tillman's methods were crude. Perhaps Stevens had lingered beyond her time at Mollison School. Public officials (Tillman was then only aspiring to office) should live by high standards rather than asking "what can I get away with?". Civilized discourse should be the aspiration of us all. The jury found that Tillman uttered quite a few falsehoods, and the discourse was neither dispassionate nor reasoned. To the extent Tillman followed the precept that "nothing succeeds like excess" she was within her rights under the first amendment and the Illinois law of libel, save for the $1.00 the jury found she owes. To the extent Tillman and associ-

ates put Stevens in fear for her safety, causing physical and mental distress, the right avenue was a suit for assault under state law. That would have been a straightforward claim. Stevens chose to bring a federal suit under a statute that required her to jump through more hoops than she could manage. She may take comfort from the dollar, for certainly the verdict and this opinion do not vindicate Tillman's methods. They show, however, the limited reach of federal law.

AFFIRMED