

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-5-2001

# Barnes Foundation v. Lower Merion Twp

Precedential or Non-Precedential:

Docket 99-2055

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

## Recommended Citation

"Barnes Foundation v. Lower Merion Twp" (2001). *2001 Decisions.* Paper 41.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/41

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 5, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-2055

THE BARNES FOUNDATION

v.

THE TOWNSHIP OF LOWER MERION; THE LOWER
MERION BOARD OF COMMISSIONERS; GLORIA P.
WOLEK, individually and in her capacity as Pr esident of
the Township Board of Commissioners; FRANK LUTZ,
individually and in his capacity as Commissioner;
KENNETH E. DAVIS, individually and in his capacity as
Commissioner; PHYLLIS L. ZEMBLE, individually and in
her capacity as Commissioner; ORA R. PIERCE,
individually and in her capacity as Commissioner; JAMES
J. PRENDERGAST, individually and in his capacity as
Commissioner; ALAN C. KESSLER, individually and in his
capacity as Commissioner; BRIAN D. ROSENTHAL,
individually and in his capacity as Commissioner;
JOSEPH M. MANKO, individually and in his capacity as
Commissioner; HOWARD L. WEST, individually and in his
capacity as Commissioner; W. BRUCE MCCONNEL, III,
individually and in his capacity as Commissioner; JAMES
S. ETTELSON, individually and in his capacity as
Commissioner; DAVID A. SONENSHEIN, individually and
in his capacity as Commissioner; REGENE H. SIL VER,
individually and in her capacity as Commissioner;
STEVEN ASHER; INA ASHER, h/w; ROBERT MARMON;
TOBY MARMON, h/w; WALTER HERMAN; NANCY
HERMAN, h/w; ARTHUR GERSHKOFF; LEONARD H.
GINSBERG; BETH R. GINSBERG, h/w; MARK MOSTER;
MARLENE MOSTER, h/w; JAMES NEALON; LESTER
SCHAEVITZ; DIANE SCHAEVITZ, h/w; MICHAEL TOAFF;
ANNA LEV-TOAFF, h/w; BRUCE SCHAINKER

Ina Asher, Steven Asher, Nancy Herman
      Walter Herman, Robert Marmon and
      Toby Marmon

      Appellants

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 96-cv-00372)
District Judge: The Honorable Ronald L. Buckwalter

Argued October 5, 2000

BEFORE: NYGAARD, GREENBERG, and COWEN,
Circuit Judges.

(Filed: March 5, 2001)

      David H. Weinstein (argued)
      Kellie A. Allen
      Weinstein, Kitchenoff, Scarlato &
       Goldman
      1608 Walnut Street
      Suite 1400
      Philadelphia, PA 19103

       Attorneys for Appellants

      Sheryl L. Auerbach
      Maura E. Fay (argued)
      Dilworth, Paxson, Kalish &
       Kauffman
      1735 Market Street
      3200 The Mellon Bank Center
      Philadelphia, PA 19103

       Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge:

I. FACTUAL & PROCEDURAL HISTORY

A. Factual History

This matter comes on before this court on appeal from an order entered on November 24, 1999, denying an application seeking attorney's fees filed by certain successful defendants in the aftermath of the entry of an order dismissing the complaint against them in this civil rights action. The Barnes Foundation (the"Barnes"), which brought the action, is a Pennsylvania corporation that operates an art gallery on North Latches Lane in Lower Merion Township, Pennsylvania, in the Philadelphia suburbs. Dr. Albert C. Barnes established the Barnes in 1922 by Indenture and Agreement conveying the real estate that the Barnes currently occupies, as well as his art collection. The Indenture provides that the Foundation's purpose is "to promote the advancement of education and the appreciation of the fine arts." App. at 178. The Barnes is governed by a board of trustees that during the time relevant to this action consisted of Shirley A. Jackson, Niara Sudarkasa, Charles A. Frank III and Richar d H. Glanton, the board's president. Lincoln University, which the Barnes describes as "a predominately and historically African-American university," see br . at 4, located in Chester County, Pennsylvania, appoints all but one of the trustees and the Mellon Bank appoints the other . At the times relevant to this opinion, the trustees except for Frank, who is or was a Senior Vice Pr esident of Mellon, were African-American.

The six appellants-defendants, Ina Asher, Steven Asher, Nancy Herman, Walter Herman, Robert Marmon and Toby Marmon, are residents of the neighborhood in which the Barnes is located. Even though the Bar nes brought this action against 17 neighbors as well as Lower Merion Township (the "Township"), the Lower Merion Board of

3

Commissioners (the "Board"), and each of the township commissioners (the "Commissioners") in their individual and official capacities, the six appellants are the only defendants who are parties to this appeal.

The events giving rise to this case originate from the Barnes' operation and use of its gallery. For many years access to the gallery was limited, see Barnes Found. v. Keely, 171 A. 267, 268 (Pa. 1934), but in 1960, pursuant to the entry of a consent decree between the Barnes and the Commonwealth of Pennsylvania, the Barnes opened the gallery to the public two days per week, except during July and August of each year. Subsequently, the Barnes opened the gallery to the public for an additional half-day per week. In 1990, Glanton became president of the Barnes' board of trustees and in that capacity, beginning in 1993, initiated a major renovation of its facilities and art gallery. By reason of the renovation, the Barnes was closed until November 1995. To fund the renovations, the Barnes sent certain selected works of art from its collection on a world tour which generated a great deal of publicity for the Barnes.

Around August or September of 1995, prior to the Barnes' reopening, it sought permission from the Township to construct a parking lot on its property. This application prompted the neighbors and other individuals to voice concerns over the facility's scheduled reopening as they believed that the reopening would cause parking, noise and pollution problems. Contemperaneously, individuals living in the area of the Barnes, including the appellants, formed The Latches Lane Neighborhood Association to oppose the Barnes' reopening, as well as to challenge certain of its other activities that they believed violated the 1922 Indenture and Agreement as well as local zoning laws. The Barnes alleges that this opposition included supporting litigation in the Montgomery County Orphan's Court concerning its request to change the terms and conditions for the operation of the gallery, in particular opposing its attempt to expand its operations from two and one-half to six days per week.

The complaint in this action alleges that the Barnes' neighbors and township officials conspired to deprive it of its constitutional rights on the basis of the race of three of

4

the four Barnes trustees and that the neighbors and officials agreed that the Township would discriminate against the Barnes by requiring "strict compliance" with township rules and regulations and by "closely monitor[ing]" the Barnes, while not tr eating its institutional neighbors in this way. See app. at 185. According to the Barnes, the conspiracy's ultimate goal was to prevent its reopening.

The Barnes set forth particularized allegations in its complaint. Thus, it charged that in the months preceding its scheduled reopening, the Township and neighbors engaged in several activities with the intention of preventing its reopening. The Barnes said that to further this goal during the last two months of construction at the Barnes, a township inspector made six unannounced visits to the site and that during the final inspection of the premises on October 30, 1995, approximately two weeks prior to the scheduled reopening, the deputy fire marshal announced prior to beginning an inspection that the facility would not pass. The Barnes alleges that he imposed several arbitrary and unreasonable requirements on it as requirements for obtaining a certificate of occupancy.

On November 9, 1995, two days before the Bar nes' scheduled opening gala events, David Latshaw, the Township Manager, sent Glanton a letter criticizing, among other things, the Barnes' lack of a traffic plan for the reopening. Glanton responded by letter indicating his belief that Latshaw's letter was overly hostile and that the Township was treating the Barnes differently from other entitites because of racial animus. The Barnes asserts that when the parties met the day of the opening gala, the Township treated it in an overtly hostile manner.

The complaint further alleges that on November 10 and 11, 1995, during the opening gala events, certain persons, including appellants Ina Asher, Walter Herman, Robert Marmon, and Toby Marmon, congr egated and picketed at the Barnes' main gate to protest its r eopening. Moreover, it asserted that unspecified individuals carried placards that read, among other things, "From LA to P A, Money Buys Justice" and "Lincoln University – Go Home." In addition,

Robert Marmon and Toby Marmon videotaped gallery
visitors entering and exiting the Barnes.

Four days after the gala events, the Commissioners held
a meeting to discuss the Barnes situation. At the hearing,
several neighbors, including Robert Marmon and Steven
Asher, spoke out against the official r eopening scheduled
for the following day, November 16, 1995. Specifically,
Robert Marmon stated, in relevant part:

> For sixteen years we hardly knew the Bar nes
> Foundation was across the street. They wer e good
> neighbors. Then, something changed. We didn't
> change. We did nothing wrong. Outsiders have taken
> over the Barnes, people who have no attachment to the
> neighborhood, to the life we have quietly enjoyed. We
> have been citizens here for decades. Mr . Glanton and
> his people have not been. We have been voters here for
> decades. Mr. Glanton and his people have not. And
> most importantly, we have been taxpayers her e for
> decades and Mr. Glanton and his people have not. I
> now finally understand what a carpetbagger is and how
> one operates.

Id. at 94. The Barnes contends that Marmon's use of the
words "outsiders," "Mr. Glanton and his people," and
"carpetbagger" indicates a racially hostile attitude both on
his part and on that of his fellow neighbors.

At the end of the meeting, the Commissioners adopted a
resolution requesting that the Bar nes delay its reopening
until it developed plans to manage the parking and crowd
problems effectively, or, if the opening proceeded, to "take
any and all appropriate actions necessary to maintain the
peace, safety, and quality of life of the surr ounding
neighborhood and its residents and assur e that the
operation of the facility by the Barnes Foundation complies
with the Township of Lower Merion zoning code." Id. at 100.
The Commissioners adopted the resolution pursuant to
their findings that the Barnes estimated that it would have
significantly more visitors in the first year following the
reopening than in previous years, and that the parking and
crowd control arrangements to accommodate the visitors
were inadequate. Moreover, the Commissioners were

6

concerned that the proposed use did not comply with the Township's zoning laws which apparently zoned the Latches Lane area for residential and educational use, but not for an art gallery. The Commissioners therefor e believed that the Barnes might violate the local zoning or dinances if the primary focus of its operations was the operation of the gallery, as opposed to conducting its educational pr ograms.

Notwithstanding the objections, the Barnes r eopened, though it did not attract as many people as anticipated. The neighbors still had complaints, however, about traffic and parking, and the concerns about potential zoning violations persisted. The Township addr essed these issues in a letter dated November 29, 1995, from the President of the Township Commissioners to the neighbors informing them that the Commissioners had heard their concerns and had been moved to act in response.

On December 13, 1995, the Township issued a violation notice against the Barnes because it was open more than two and one-half days per week and received mor e than 500 visitors per week, thus violating the operating restrictions imposed on it since 1961. The Bar nes contends that the Township zoning officer admitted that he had no rational basis for ordering the Barnes to comply with the 1961 attendance levels restrictions, particularly inasmuch as the Township had not been doing so immediately prior to its closure for renovations.1

B. Procedural History

Following the issuance of the December 13, 1995 notice of violation the Barnes filed a district court complaint on January 18, 1996, alleging that the Township, the Board, the Commissioners and 17 of the Barnes' r esidential neighbors deprived and conspired to deprive it of its rights under the Due Process and Equal Protection Clauses of the United States Constitution contrary to 42 U.S.C.SS 1983 and 1985 by treating it differently from its institutional neighbors as a result of a racially-motivated conspiracy between the Township and the neighbors.2 On March 18,

_____

1. The notice of violation was withdrawn, butfiled again on the same grounds on August 6, 1996.
2. The complaint included an immaterial allegation that Glanton is a Republican. See app. at 179. In this r egard, we point out that a party to

1996, the Township, the Board and the Commissioners filed motions to dismiss the Barnes' complaint, but the district court denied the motions by Memorandum and Order dated June 3, 1996. See Barnes Found. v. Township of Lower Merion, 927 F. Supp. 874, 875 (E.D. Pa. 1996).3 Between March 18, 1996, and April 1, 1996, all of the neighbor defendants also filed motions to dismiss the complaint, contending that they enjoyed First Amendment immunity from liability for petitioning the government. Id. at 875-76. The district court agreed with the neighbors and thus, in its June 3, 1996 Memorandum and Order , granted their motions to dismiss. See id. at 878.

Subsequently the Township and the Commissioners filed a joint counterclaim asserting that by bringing this action the Barnes abused the judicial process. The Barnes responded to the counterclaim with a motion to dismiss which the district court denied. Thereafter , the Barnes unsuccessfully sought permission to amend the complaint further, adding new claims against the neighbor defendants and asserting claims on behalf of Glanton individually.

Following the close of discovery, the Township, the Board and the Commissioners filed motions for summary judgment on all of the Barnes' claims, which the district court granted on September 26, 1997. See Bar nes Found. v. Township of Lower Merion, 982 F . Supp. 970, 1005 (E.D. Pa. 1997). The Township's and Commissioners' counterclaim was dismissed thereafter pursuant to a settlement, and a final order was enter ed on October 2, 1998, and then amended on October 28, 1998. The Bar nes appealed from the district court's final or der but then voluntarily dismissed the appeal. Glanton also filed an appeal which we dismissed on March 12, 1999.

_____

litigation should not gratuitously set forth in its pleadings the political
affiliation of its president lest the court believe that the party is making
an appeal for favorable treatment on account of that affiliation.

3. The Commissioners and other Township officials also filed a defamation action against the trustees of the Bar nes on March 3, 1996, in state court.

8

Upon resolution of the summary judgment motions, the appellants filed a motion for attorney's fees and expenses pursuant to 42 U.S.C. S 1988 which the district court denied on November 24, 1999. See Barnes Found. v. Township of Lower Merion, No. CIV. A. 96-372, 1999 WL 1065213 (E.D. Pa. Nov. 24, 1999). The appellants then appealed from the district court's November 24, 1999 order.4

II. DISCUSSION

A. Standard of Review

We review the district court's or der denying the appellants' motion for attorney's fees on an abuse of discretion basis. See EEOC v. L.B. Foster Co., 123 F.3d 746, 750 (3d Cir. 1997); Brown v. Bor ough of Chambersburg, 903 F.2d 274, 277 (3d Cir. 1990). In this case, the appellants challenge the district court's conclusions both as to the legal and factual sufficiency of the Barnes' claims. We exercise plenary review over sufficiency of evidence issues and legal issues but use the clearly erroneous standard when reviewing factual findings. See Quir oga v. Hasbro, Inc., 934 F.2d 497, 502 (3d Cir. 1991); Rode v. Dellarciprete, 892 F.2d 1177, 1182-83 (3d Cir. 1990). 5

_____

4. Defendants Leonard H. Ginsburg and Beth Ginsburg joined in the motion but are not parties to the appeal. Other defendants also submitted motions seeking fees but as those motions are not implicated on this appeal we need not discuss their disposition.

5. We note that in his dissenting opinion Judge Nygaard recites that we have vested the trial court with "discretionary authority [with respect to fee applications] for good reason [as it] has the distinct advantage of hearing and seeing evidence and testimony first-hand and has viewed the parties and the cause over a longer time period." Dissent at 27. While we do use an abuse of discretion standar d on this appeal, we point out that Judge Nygaard's reasoning is not applicable in this case inasmuch as Judge Brody granted the motions to dismiss and for summary judgment and thereafter, on May 26, 1998, the case was reassigned to Judge Buckwalter who denied appellants' application for fees. Furthermore, Judge Buckwalter did so on the basis of the record without conducting a trial-type hearing. Consequently, he did not have an opportunity to see the parties testify first-hand and, in reality, even though we are adjudicating this appeal on an abuse of discretion basis, we doubt that Judge Buckwalter had any advantage over us in considering the appellants' fee application.

B. Availability of Attorney's Fees Pursuant to Section 1988

The appellants contend that the district court err ed in concluding that the Barnes' claims wer e neither legally nor factually frivolous and that it should have awar ded them attorney's fees on both of those bases pursuant to section 1988. Section 1988 provides, in relevant part: "In any action or proceeding to enforce a pr ovision of sections . . . 1983 [and] 1985 . . . of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. S 1988(b). The"prevailing party" can be either the plaintiff or the defendant but the standard for awarding attorney's fees to prevailing defendants is more stringent than that for awarding fees to pr evailing plaintiffs. See Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700 (1978); L.B. Foster, 123 F.3d at 750-51.6 As the Supreme Court held in Christiansburg, while prevailing plaintiffs "should or dinarily recover an attorney's fee unless special circumstances would r ender such an award unjust," a prevailing defendant is entitled to attorney's fees only "upon a finding that the plaintiff 's action was frivolous, unreasonable or without foundation . . . ." Christianburg, 434 U.S. at 416-17, 421, 98 S.Ct. at 698, 700. Nevertheless, it is not necessary that the prevailing defendant establish that the plaintiff had subjective bad faith in bringing the action in or der to recover attorney's fees. Rather, the relevant standard is objective. See Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178 (1980). Furthermore, the Supr eme Court has indicated that "it is important that a . . . court resist the understandable temptation to engage in post hoc reasoning by concluding that because a plaintiff did not ultimately prevail his action must have been unreasonable or without

_____

6. The standards for assessing claims for attorney's fees pursuant to section 1988 and under the Civil Rights Act of 1964, 42 U.S.C. S 2000e-5(k), are identical. See, e.g., Hensley v. Eckerhart, 461 U.S. 424, 433 n.7,
103 S.Ct. 1933, 1939 n.7 (1983); Hughes v. Rowe , 449 U.S. 5, 14, 101 S.Ct. 173, 178 (1980). Accordingly, cases used to interpret one statute may be used to interpret the other. See Brown, 903 F.2d at 277 n.1; Sullivan v. Pennsylvania Dep't of Labor & Indus., 663 F.2d 443, 447 n.5 (3d Cir. 1981).

10

foundation." Christiansburg, 434 U.S. at 421–22, 98 S.Ct. at 700.

We have relied on several factors in determining whether a plaintiff 's unsuccessful civil rights claim was frivolous including whether the plaintiff established a prima facie case, the defendant offered to settle, the trial court dismissed the case prior to trial or the case continued until a trial on the merits. See L.B. Foster, 123 F.3d at 751. Other factors that courts have considered in determining if an action was frivolous include whether the question in issue was one of first impression requiring judicial resolution, the controversy is based sufficiently upon a real threat of injury to the plaintiff, the trial court has made a finding that the suit was frivolous under the Christiansburg guidelines, and the record supports such afinding. See Unity Ventures v. County of Lake, 894 F.2d 250, 253–54 (7th Cir. 1995). These considerations, however, are merely guidelines, not strict rules; thus "[d]eter minations regarding frivolity are to be made on a case-by-case basis." Sullivan v. School Bd., 773 F.2d 1182, 1189 (11th Cir . 1983).

C. Legal Sufficiency of the Barnes' Claims

The appellants first argue that the Bar nes knew or should have known that they enjoyed First Amendment immunity for their conduct pursuant to the Noerr – Pennington doctrine. The Barnes contends that an individual's immunity under that doctrine for alleged violations of civil rights was not established in this circuit at the time it filed suit, particularly in cases in which it was alleged that a racially discriminatory animus motivated a defendant's actions. Therefore, it ar gues that its case against the neighbors, including the appellants, was not legally frivolous.

Unquestionably, given the outstanding case law at the time the Barnes filed suit against the neighbors, the district court properly dismissed its case against them by reason of their First Amendment immunity and, indeed, the Bar nes on this appeal does not challenge that disposition. But, as we shall explain, prior to the institution of this action neither the Supreme Court nor this court had held expressly that the Noerr–Pennington doctrine provides an

11

immunity for First Amendment activity allegedly
constituting a civil rights abuse, especially when a racially
discriminatory animus allegedly motivated the activity.

1. Status of the Law in the Supreme Court and this
      Circuit

The Noerr-Pennington doctrine originated more than 30
years prior to the Barnes filing the complaint in this action
when the Supreme Court held in Easter n Railroad
Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S.
127, 81 S.Ct. 523 (1961) ("Noerr"), and United Mine Workers
v. Pennington, 381 U.S. 657, 85 S.Ct. 1585 (1965)
("Pennington"), that an individual is immune from liability
for exercising his or her First Amendment right to petition
the government. See Pennington, 381 U.S. at 669-70, 85
S.Ct. at 1593; Noerr, 365 U.S. at 137-38, 81 S.Ct. at 529-
30; see also City of Columbia v. Omni Outdoor Advertising,
Inc., 499 U.S. 365, 379-80, 111 S.Ct. 1344, 1353-54
(1991). The Court made these rulings in an antitrust
context where the defendants engaged in campaigns
directed towards obtaining governmental action for the
purpose of eliminating competition in their r espective
industries. See Pennington, 381 U.S. at 660, 85 S.Ct. at
1588; Noerr, 365 U.S. at 129, 81 S.Ct. at 525. In those
situations, the plaintiffs alleged that the defendants'
conduct violated the Sherman Antitrust Act. See
Pennington, 381 U.S. at 659, 85 S.Ct. at 1588; Noerr, 365
U.S. at 129, 81 S.Ct. at 525. The Supreme Court disagreed
with the plaintiffs, holding that the Sher man Act did not
proscribe the campaign. See Pennington, 381 U.S. at 671,
85 S.Ct. at 1594; Noerr, 365 U.S. at 145, 81 S.Ct. at 533.
The Court recognized that the "right of petition is one of the
freedoms protected by the Bill of Rights, and we cannot, of
course, lightly impute to Congress an intent to invade these
freedoms." Noerr, 365 U.S. at 138, 81 S.Ct. at 530. The
Court held that there was immunity regar dless of the
defendants' motivations in waging their campaigns, as it
recognized that the right of individuals to petition the
government "cannot properly be made to depend on their
intent in doing so." Id. at 139, 81 S.Ct. at 530.

The Supreme Court and this court have extended the
scope of the Noerr-Pennington doctrine beyond the antitrust

12

context. Thus, in NAACP v. Claiborne Hardware Co., 458 U.S. 886, 102 S.Ct. 3409 (1982), the Court applied the Noerr–Pennington doctrine to a civil conspiracy claim by white merchants whose businesses were boycotted by the NAACP. See id. at 912–14, 102 S.Ct. at 3425–26. The boycott was intended to force compliance with a list of demands for racial equality and integration that had been presented to white elected officials. See id. at 889–90, 102 S.Ct. at 3413. The boycott was supported by speeches, meetings and picketing, although there were threats of actual violence as well. Applying the principles set forth in Noerr–Pennington, the Court unanimously held that the First Amendment protected the nonviolent aspects of the boycott. See id. at 907–08, 102 S.Ct. at 3422 (reaffirming principle that " `the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process' " (quoting Citizens Against Rent Control Coalition for Fair Housing v. City of Berkeley, 454 U.S. 290, 294, 102 S.Ct. 434, 436 (1981))). The Court reached its conclusion even though some members of the group may have engaged in unprotected conduct.

We extended the principles of the Noerr –Pennington doctrine in Pfizer Inc. v. Giles (In re Asbestos School Litigation), 46 F.3d 1284 (3d Cir . 1994), and Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155 (3d Cir. 1988), in which we held that the respective defendants were immune from liability for civil conspiracy pursuant to the First Amendment. See Pfizer, 46 F .3d at 1289–90; Brownsville, 839 F.2d at 160. In Brownsville, the plaintiff, a nursing home, alleged that the defendants engaged in a civil conspiracy designed to lead to the state revoking its nursing home license. See Brownsville, 839 F.2d at 156. Two defendants, private citizens who visited the nursing home, communicated their concern over what they viewed as appalling conditions to federal and state officials. See id. at 157–58. They engaged the efforts of Senator Heinz, and together sought to have the home decertified. See id. at 158. The district court granted the defendants' summary judgment motions, and we affirmed. See id. Relying on the Noerr–Pennington doctrine we held that the defendants were

13

immune from conspiracy liability for damages r esulting from inducing official action. See id.  at 160.

Likewise, in Pfizer the plaintiff alleged that the defendants, several manufacturers of asbestos-containing building products ("ACBPs"), conspir ed with each other and acted in concert to produce and sell ACBPs without warnings and with knowledge of the danger they presented. See Pfizer, 46 F.3d at 1286. One of the defendants, Pfizer, moved for summary judgment on the civil conspiracy and concert of action claims, claiming that the evidence supporting the plaintiffs' claims consisted entirely of the fact that Pfizer had manufactured an ACBP fr om 1964 until 1972 and that in 1984, Pfizer became associated with the Safe Buildings Alliance ("SBA"), a lobbying or ganization that, among other things, represented its members' interests before federal, state and local government officials and agencies. See id. at 1287. The district court denied Pfizer's motion on the ground that a jury r easonably could conclude there was a conspiracy based on Pfizer's involvement with and financial support for the SBA. See id. Pfizer unsuccessfully moved for reconsideration and, following the denial of its request for certification of an interlocutory appeal, it petitioned us seeking a writ of mandamus that effectively would overtur n the district court's decision. See id. at 1288.

We granted Pfizer's petition. See id.  at 1290. Relying on Claiborne Hardware, we found that the First Amendment right to petition government protected Pfizer's association with the SBA and that to the extent that the First Amendment did not protect the SBA's activities, Pfizer could not be held liable absent evidence that its actions with regard to the SBA were intended specifically to further that wrongful conduct.

Therefore, at the time the Barnesfiled its complaint, we already had applied the Noerr-Pennington doctrine in varied contexts. Nevertheless, while in Pfizer we stated that we saw no reason why this principle of First Amendment immunity was not meant to have general applicability, we had not determined in an actual case involving a claim of an infringement of civil rights that a Noerr -Pennington defense was available when the Barnes filed its complaint

14

in this action. While not determinative, this circumstance mitigates against a finding that the Barnes' suit against the neighbors was legally frivolous. See Tarter v. Raybuck, 742 F.2d 977, 987 (6th Cir. 1984) (r eversing award of attorney's fees to prevailing defendant in part because legal issue was not well-settled in circuit or country).

2. Status of the Law in Other Circuits

We recognize that by the time the Bar nes filed its complaint, several other courts of appeals had made the Noerr-Pennington doctrine and First Amendment immunity expressly applicable as defenses to causes of action arising under federal civil rights laws. See Eaton v. Newport Bd. of Educ., 975 F.2d 292, 299 (6th Cir . 1992) (holding teachers' union and individual immune under Noerr-Pennington for lobbying that led to school principal's dischar ge); Video Int'l Prod., Inc. v. Warner Amex Cable Communications, Inc., 858 F.2d 1075, 1084 (5th Cir. 1988) (finding Noerr-Pennington precluded defendant's liability as conspirator with city in violation of civil rights under 42 U.S.C. S 1983); Stevens v. Tillman, 855 F.2d 394, 404-05 (7th Cir. 1988) (noting applicability of Noerr-Pennington as defense to plaintiff 's civil rights action, but finding for defendants on other grounds); Evers v. County of Custer, 745 F.2d 1196, 1204 (9th Cir. 1984) (upholding award of attorney's fees to defendants immunized from liability by Noerr-Pennington for petitioning government to declare r oad spanning plaintiff 's land public); Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607, 614-15 (8th Cir. 1980) (holding private citizen immune from section 1983 liability in zoning dispute). We think that this point is important because, even in the absence of binding precedent in this court, the pr esence of well-established case law in other circuits when an action is filed could demonstrate that the action was frivolous.

Only one of the foregoing cases, however , arose in the context of allegedly racially-motivated petitioning activity. Stevens involved a federal civil rights claimfiled by a school principal against members of the local parent-teacher association. See Stevens, 855 F.2d at 395. The plaintiff alleged that certain members of the association conspired to influence the board of education to transfer her to

15

another school because of her race.7 See id. But the court of appeals did not reach the immunity issue because it determined that the plaintiff had not suffered an injury at official hands. See id. at 405. The court remarked in dicta, however, that it "very much doubt[ed] that S 1985(3) properly may be used to penalize racially-motivated political campaigns, any more than the antitrust laws may be used to penalize deceitful campaigns to obtain pr otection from competition." Id. at 404. While we r ecognize that this statement certainly should have been an indication to the Barnes that its claims against the neighbors likely would not succeed, still inasmuch as it was made in a dif ferent circuit it does not carry such weight as to make the Barnes' claim legally frivolous.

Moreover, we are encouraged to r each the conclusion that the Barnes' action was not legally frivolous by the circumstance that courts addressing that doctrine in a civil rights context have not adopted the Stevens position universally. In LeBlanc-Sternberg v. Fletcher, 781 F. Supp. 261 (S.D.N.Y. 1991), the district court denied the defendants' motion to dismiss in a situation in which they were accused of petitioning for the incorporation of a village to impose strict zoning rules which would discourage and prevent Orthodox Jewish residential neighborhoods from developing in the community. See id. at 267. The court stated:

> Taking the plaintiffs' allegations of defendants' motives as true, we are not prepared to conclude that defendants' conduct is protected by the first amendment. The `first amendment . . . may not be used as the means or the pretext for achieving "substantial evils" which the legislatur e has the power to control.' . . . To allow individuals to avail themselves of first amendment protections when it is alleged that their conduct will lead to official misconduct in violation of the United States Constitution would defeat the purpose of the civil rights laws.

_____

7. The plaintiff was white while the defendants, as well as the majority of the population of the plaintiff 's school, were African-American. See Stevens, 855 F.2d at 395.

16

Id. (quoting California Motor T ransp. Co. v. Trucking Unlimited, 404 U.S. 508, 515, 92 S.Ct. 609, 614 (1972)). In California Motor Transport, the Court held that the plaintiff, a trucking company, stated a cause of action under the Clayton Act against its competitors where the competitors engaged in concerted activities to institute state and federal proceedings designed to interfere with the plaintiff 's business. See California Motor Transp., 404 U.S. at 509, 92 S.Ct. at 611. The Court relied on the "sham" exception to the Noerr–Pennington doctrine which denies immunity for petitioning activity where the purpose is solely to interfere with the business relationships of a competitor rather than to effectuate governmental action aimed at accomplishing the same result. Noerr, 365 U.S. at 144, 81 S.Ct. at 533.

Obviously LeBlanc–Sternberg was not binding authority in this circuit when the Barnes initiated this case but the sham exception to Noerr–Pennington immunity as set forth in Noerr and California Motor T ransport certainly was. While there is a legitimate argument that the sham exception to the Noerr–Pennington doctrine could not have been applicable here and that the Barnes should have so recognized, nevertheless LeBlanc–Ster nberg demonstrates that when the Barnes instituted this action there was some question as to the applicability of the Noerr –Pennington doctrine as a defense to its claim.

Overall, we are satisfied that the availability of the Noerr–Pennington doctrine as a defense to a federal civil rights claim where a defendant's conduct allegedly was racially motivated was not completely established in this court at the time the Barnes filed suit in this matter. Moreover, we are satisfied that notwithstanding the tr end of the cases at that time, other courts had not come to a unifor m conclusion on the point. Accordingly, taking into account the standards set forth in Christiansbur g and L.B. Foster, we conclude, though the issue is close, that the district court did not err in determining that the Bar nes' claim was not legally frivolous.

Before we close our discussion of the Noerr –Pennington doctrine we hasten to add that persons contemplating bringing suits to stifle First Amendment activity should draw no comfort from this opinion because the uncertainty

of the availability of a First Amendment defense when a plaintiff brings a civil rights case now has been dispelled. This point is of particular importance in land-use cases in which a developer seeks to eliminate community opposition to its plans as this opinion should make it clear that it will do so at its own peril.

D. Factual Sufficiency of Barnes' Claims

Notwithstanding our conclusion with respect to the legal question of the applicability of the Noerr -Pennington doctrine, the factual sufficiency vel non of the Barnes' claims is quite another matter which we must consider separately. In considering this issue, we start by setting forth the elements of a cause of action under 42 U.S.C. S 1985(3), as Barnes sued the neighbors and thus the appellants under that statute. Section 1985(3) pr ovides a cause of action if: (1) two or more persons conspire to deprive any person of the equal protection of the law; (2) one or more of the conspirators perfor ms or causes to be performed any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintif f in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States. See Griffin v. Breckenridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 1798-99 (1971); Bougher v. University of Pittsburgh, 882 F .2d 74, 79 (3d Cir. 1989). Section 1985(3), however, does not include a requirement that the conspirators act"under color of state law," as is the case in an action under 42 U.S.C.S 1983, as section 1985(3) makes actionable private conspiracies to deprive a citizen of the equal enjoyment of rights secured to all. See Griffin, 403 U.S. at 95-102, 91 S.Ct. at 1794-98; Phillips v. Trello, 502 F.2d 1000, 1004-05 (3d Cir. 1974). Here, the Barnes predicated its claim of an equal protection violation on racial discrimination. While the Bar nes also brought its action against the appellants under 42 U.S.C. S 1983, we see no need to discuss the possible applicability of that section to the appellants who are private parties as our conclusion with respect to the Barnes' section 1985 claim applies to its section 1983 claim as well.

In analyzing the sufficiency of the factual basis for the Barnes' claims, the district court first r ecognized that the Barnes never proffered any dir ect evidence of racial

18

hostility. See Barnes Found., 1999 WL 1065213, at *3. The court found that instead the Barnes based the suit on conduct that, while subtle, could be consider ed no less discriminatory. See id. Therefor e, the court characterized the issue as follows:

> Thus, in deciding the groundless issue, the key questions are: Can this complaint be said to have a factual foundation for its allegations of discriminatory treatment based on race when those allegations are based upon a theory that defendants' conduct, though not found by direct evidence to be racially motivated, was actually a sophisticated cover-up for racial discrimination. That is, can a reasonable factual foundation be established to support plaintif f 's theory by drawing inferences from certain objective facts which are generally not in dispute?

Id. at *4. The district court answer ed its question affirmatively, though it qualified the answer by requiring that the inference be reasonable. See id. The court held that to base a complaint on circumstantial evidence, the "plaintiff must be able to point to a factual pattern which fairly implies racial discrimination, going beyond a mere suggestion that in today's world, subtle conduct masks racism." Id. The court found that the inferences supporting the Barnes' complaint were reasonable and thus it denied the appellants' motion for attorney's fees.

In so holding, however, the district court completely ignored the opinions of the Supreme Court in Claiborne Hardware and of this court in Pfizer which held that the First Amendment requires more than evidence of association to impose liability for conspiracy and, in fact, prohibits liability on that basis alone. See Claiborne Hardware, 458 U.S. at 918-19, 102 S.Ct. at 3428-29; Pfizer, 46 F.3d at 1289. Thus, the Supr eme Court in Claiborne Hardware explained that "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." Claiborne Hardwar e, 458 U.S. at 920, 102 S.Ct. at 3429; see Pfizer, 46 F.3d at 1289. Furthermore, the court must judge this intent "according to the strictest law."

19

Claiborne Hardware, 458 U.S. at 919, 102 S.Ct. at 3429. Therefore, while it is clear that Claiborne Hardware and Pfizer were the controlling legal authorities when the district court denied the appellants' applications, and continue to be so, the district court did not follow or even cite either of those cases when it made its ruling.

How, then, did the district court reach its result inasmuch as it acknowledged that there was no direct evidence of racial hostility on the appellants' part? See Barnes, 1999 WL 1065213, at *3. It did so by concluding that on the record before it, one reasonably could draw an inference of racial animus by the appellants sufficient to support a claim against all of them. Id. at *4. It based this conclusion on what it deemed a representative example of the Barnes' evidence of discriminatory treatment including: (1) an affidavit from Thomas Massaro, a land use consultant, who opined that the neighbors were so firmly and irrationally opposed to the Barnes' proposal that it suggested their concerns were a pretext for racial prejudice; (2) Massaro's opinion that the neighbors' concerns about traffic problems caused by the Barnes were inconsistent with the realities of the neighborhood given the close proximity of St. Joseph's University and the Episcopal Academy; (3) an affidavit from Peter Kelsen, the attorney retained by the Barnes to secure a parking lot building permit, stating the Township should have allowed the parking lot without zoning board approval, Township representatives and neighbors expressed a high level of animosity towards Glanton, their meetings were becoming increasingly confrontational and that comments by the neighbors were of an overly discriminatory nature; (4) an affidavit from Ann B. Laupheimer, an attorney for the Barnes, stating that she discussed the possibility of a lawsuit with other lawyers and, following an investigation into the law and facts, determined there was sufficient evidence to warrant proceeding; (5) an affidavit from Jordana Cooper, an attorney for the Barnes, acknowledging that while she did not anticipate the Noerr – Pennington defense, there was little reason to do so because it was a novel one in this court at the time; (6) examples of unequal treatment by the Township with regard to traffic and parking between the Barnes and its institutional

20

neighbors; (7) a Township Commissioner's alleged statement that the Commissioners were outraged and were going to help; and (8) Robert Marmon's statements at the November 15, 1995 meeting where he used "code words" such as "Mr. Glanton and his people,""carpetbaggers" and "outsiders" in discussing the situation at the Barnes. See id. at *2-3. This evidence, in addition to the historical background of the Barnes which involved overt racial hostility from the surrounding community, led the district court to conclude that it was reasonable to infer that each of the neighbors and thus each of the appellants was motivated by racial hostility. Id. at *4.

We hold that the district court erred in its conclusion as obviously the items it cited were a totally inadequate foundation on which to predicate an infer ence that racial animus motivated the appellants, except possibly Robert Marmon. Indeed, it is not acceptable to pr edicate inferences of racial animus against the neighbors and thus the appellants because of the legal views of the Bar nes' professional representatives supporting its cause or because of the actions of Township officials. In particular, we point out that the Barnes' repr esentatives and the Barnes itself should have recognized that persons may controvert their views without being racists.

Furthermore, with the exception of the last example considered by the district court, which mentions only Robert Marmon, none of the evidence that does refer to the Barnes' neighbors specifies which neighbors were involved in the actions. There are merely allegations that certain unnamed and unidentified "neighbors" wer e involved in allegedly discriminatory treatment. The same is true for the evidence the Barnes has highlighted on this appeal, see Barnes' Br. at 22-24, namely that: (1) the neighbors expressed concerns over increased traffic and parking problems associated with the use of the Bar nes' facility, but did not complain about the traffic generated by St. Joseph's University and the Episcopal Academy; (2) Robert Mar mon and Toby Marmon, Ina Asher and W alter Herman were seen in front of the Barnes among picketers holding signs reading "From LA to PA, Money Buys Justice" and "Lincoln University -- Go Home;" and (3) the neighbors founded,

21

were members of, and contributed money to the Latches Lane Neighborhood Association for the purpose of acting in concert against the Barnes.8

There was, therefore, no evidence indicating racial animus on the part of five of the six defendants: Ina Asher, Steven Asher, Nancy Herman, Walter Herman or Toby Marmon. Nevertheless, in the absence of that evidence the district court relied on generalized assertions of discriminatory treatment to permit an inference to be drawn of racial animus on the part of all of the neighbors and thus of the appellants. This reliance plainly was contrary to the Supreme Court's ruling in Claiborne Hardware that in order to hold an individual liable by reason of association with a group ther e must be evidence, judged according "to the strictest law," that the individual held a specific intent to further those illegal aims. Accordingly, as to appellants Ina Asher , Steven Asher, Nancy Herman, Walter Herman and T oby Marmon, the district court erred in concluding that the Bar nes' complaint was not factually groundless and we thus will reverse the district court's order denying their motion for attorney's fees.

In reaching our result, we feel constrained to point out that surely it is outrageous that the Bar nes, while purportedly securing its own civil rights, br ought a groundless action against the appellants ther eby trampling

_____

8. We are aware that the Bar nes alleged that appellant Steven Asher stated that we would prefer to live across the street from a "Kravco mall" than across the street from the Barnes. In this regard the Barnespoints out that Kravco owns or operates the King of Prussia mall which it asserts is "the largest mall in Pennsylvania." App. at 20–21. Obviously there was nothing racial in this statement as it merely demonstrated the strength of his opposition to the Barnes' reopening. We also point out that there is some question as to whether anyone, let alone any of the appellants, picketed with the signs that the Bar nes mentions. Indeed, the district court in its opinion granting summary judgment said "[t]he Barnes offers only a newspaper article published in the Philadelphia Inquirer reporting that such picketers and signs had been seen. The newspaper article is hearsay and cannot be consider ed on a motion for summary judgment." Barnes Found., 982 F. Supp. at 988 n.14. Nevertheless we will assume that the signs wer e present.

their First Amendment rights. To justify its conduct, the Barnes in the conclusion of its brief quotes our opinion in Aman v. Cost Furniture Rental Corp. , 85 F.3d 1074, 1082 (3d Cir. 1996), to the effect that discrimination "continues to pollute the social and economic mainstream of American life" and that the courts should "ensur e that prohibited discrimination is not approved under the auspices of legitimate conduct." But in Aman we did not suggest that a minority-led organization was free tofile a baseless suit against persons challenging its activities and then be able to seek shelter behind its minority status when the wrongfully charged defendants seek r edress against it for having been put to the expense of defending against the action. In short, a minority-led organization is not exempted from facing the consequences of its wr ongful actions merely because of the race of its leadership. But the fact is that unless we discredit the deposition testimony of Charles A. Frank, III, which we discuss below, we must conclude that the Barnes cynically brought this frivolous action to capitalize on its minority status to achieve its goal of alleviating its parking problems.

Notwithstanding our result with respect to the other five appellants, we are satisfied that the Bar nes did proffer evidence that racial animus may have motivated Robert Marmon's conduct. While his comments during the Commissioners' meeting were arguably racially ambiguous, we cannot say that it is unreasonable to infer that they communicated racial hostility and discriminatory motivation. Accordingly, although the evidence is thin, given the deferential standard of r eview on this appeal we cannot conclude that the district court abused its discretion in determining that the Bar nes' claim against Robert Marmon was not factually groundless.9

_____

9. The appellants recognize that ther e was evidence that Robert Marmon acted for racial reasons, see br . at 33, though they deny that he did so. Of course, the absence of evidence to support a conclusion that the other appellants acted out of that motivation would not mean that the section 1985 conspiracy claim against Robert Marmon therefore was necessarily groundless as there were other defendants in this action with whom he could have conspired.

23

The appellants also contend that the district court erred by failing to consider their evidence that Glanton and thus the Barnes had a wrongful ulterior motive in filing suit against them, namely to expedite the Township's approval for an on-site parking lot in part by stifling public opposition to its plans. The appellants argue that if left undisturbed, the district court's denial of their motion for attorney's fees will have a chilling ef fect on First Amendment activity by private individuals as they will face the possibility of being burdened with substantial legal expenses for engaging in constitutionally-pr otected conduct. In considering this argument we point out that the appellants' evidence of the Barnes' wr ongful motive in bringing this action obviously was compelling because they elicited the information from Franks at his deposition. After all, inasmuch as Franks was a Barnes trustee he would have been in a position to understand what the Bar nes was doing and the motivations for its actions. Franks testified that Glanton "has all along represented his interest in resolving the parking issues, and [Glanton] felt that the filing of [the] complaint [in this action] would accelerate the settlement of that issue. [Glanton] was only after his parking and nothing else." App. at 276. Further more, Franks stated his position that this action was of doubtful validity contemperaneously with the events as they unfolded for on January 18, 1996, the day the Bar nes filed this suit, he wrote Glanton and indicated that he was opposed to filing the complaint because he had"serious concerns whether the allegations in the draft complaint are appropriate or accurate." App. at 279.

In denying the appellants' motion for attorney's fees, the district court did not mention their claim that the Barnes had brought this action in bad faith. The Bar nes seems to suggest that from this omission we should infer that the court considered and rejected the bad faith claim. See Barnes' Br. at 27-30. We, however, recently have held that "it is incumbent upon a district court to make its reasoning and application of the fee-awards jurisprudence clear, so that we, as a reviewing court, have a sufficient basis to review for abuse of discretion." Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 196-97 (3d Cir . 2000). Without any statement from the district court explaining its reason for

24

not allowing the appellants attorney's fees on the basis of this claim, we are not able to say the district court rejected their argument. We recognize that a reversal on this bad faith point may have no practical consequences to the appellants other than Robert Marmon as they ar e entitled to reasonable attorney's fees for the r easons we already have set forth. Nevertheless, we will reverse on the bad faith claim and will remand the case to the district court for a determination of the appellants' claim that the Barnes brought this action in bad faith because Robert Marmon is entitled to receive the benefit of a r econsideration of his claim on this basis.

## III. CONCLUSION

For the foregoing reasons we will r everse the order of the district court of November 24, 1999, and will r emand the case to that court for calculation of the attor ney's fees that should be allowed to the appellants other than Robert Marmon and to reconsider the claim that the Barnes brought this action in bad faith. In the event that the court determines that the Barnes brought this action in bad faith it shall allow him reasonable attorney's fees as well.

25

NYGAARD, Circuit Judge, dissenting.

Although I agree with the Majority's holding that the Barnes Foundation's claims against the neighbors were not frivolous, I disagree that the Foundation's claims were factually groundless. I would affirm the District Court because its factual findings support its conclusion that the Foundation had a reasonable factual basis for bringing its S1985 claims. The decision made by the District Court was discretionary and mere disagreement with the lower court's decision is insufficient to overcome the substantial discretion the District Court has traditionally enjoyed. I fear the Majority elides our deferential postur e when reviewing for an abuse of discretion and crosses the line that limits our interference with a District Court's decision under an abuse of discretion standard. Accor dingly, I dissent.

Before focusing on the District Court's factualfindings and why I find them sufficient to defeat the neighbors' argument that the Foundation's claims wer e not groundless, a review of our abuse of discr etion standard for reviewing attorney's fees is instructive. We have a long and well-established history of deferring to a District Court's award of attorney's fees. As we have often said, "the award of a reasonable attorney's fee is within the District Court's discretion." Silberman v. Bogle , 683 F.2d 62, 64-65 (3d Cir. 1982); Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 115 (3d Cir. 1976). Thus, as with any issue reviewed for abuse of discretion, our standard of review is narrow. See Silberman, 683 F.2d at 65. We will reverse only when the"judicial action is arbitrary, fanciful, or unreasonable, or when improper standards, criteria, or procedures ar e used." Evans v. Buchanan, 555 F.2d 373, 378-79 (3d Cir . 1977). Stated differently, discretion is abused only where "no reasonable [person] would take the view adopted by the trial court." Lindy, 540 F.2d at 115. If, however , reasonable persons could differ as to the propriety of the challenged action, then it cannot be said that the trial court abused its discretion. See id.

Moreover, our task on review "is not to substitute the remedy [we] would have imposed had [we] been the district court; rather it is to determine whether the district court

26

observed the promulgated guidelines." Evans, 555 F.2d at 379. An abuse of discretion does not exist simply because we disagree with the District Court's decision. See Lindy, 540 F.2d at 116.

We have vested the District Courts with discr etionary authority for good reason. The District Court has the distinct advantage of hearing and seeing evidence and testimony first-hand and has viewed the parties and the cause over a longer time period. As one commentator remarked,

> [i]t is not that [the trial judge] knows more than his loftier brothers; rather, he sees mor e and senses more. In the dialogue between the appellate judges and the trial judge, the former often seem to be saying: `You were there. We do not think we would have done what you did, but we were not present and we may be unaware of significant matters, for the r ecord does not adequately convey to us all that went on at the trial. Therefore, we defer to you.'

Maurice Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 SYRACUSE  L. REV. 635, 663 (1971). Given the trial court's proximity to the issues, it is eminently appropriate that "[o]ne seeking to establish [ ] an abuse of discretion bears a heavy burden." Lindy, 540 F.2d at 116.

I heartily agree with our esteemed colleague, Judge Aldisert, who, in an earlier fee case, said:

> At bottom, this case is about whether an appellate court appreciates the allocation of competence between trial courts and reviewing courts. To be sure, statements of deference by appellate courts to district courts appear in this court's dispositions . . . . But quoting a standard of review and r especting it are different matters . . . . We must be vigilant of this court's increasing proclivity to deny substituting its judgment for that of the district court, but then to proceed with the tack that it expressly r enounces.

Washington v. Philadelphia County Court of Common Pleas, 89 F.3d 1031, 1044 (3d Cir. 1996). Mor eover, I identify fully

27

with what he referred to as "a personal expression of what troubles me":

> Appellate courts seem to have lost respect for the narrow review encompassed in reviewing an exercise of discretion.
>
> . . . .
>
> . . . Instead of playing a limited role in the determination of attorney's fees in limited review of discretion, the appellate courts, like the pr overbial camel, have not only stuck their noses under the district court's tent, but they are fully inside ranging around in the turf that properly belongs to the district courts.

Id. at 1048. Judge Aldisert was dissenting from an opinion I had joined. But, I was as wrong then as I believe the majority is now. "Abuse" itself is a serious accusation and in using the term "abuse" to define our standard of review, our jurisprudence has recognized the institutional superiority of the District Court. Therefor e, we should not readily discard its findings and conclusions.

A prevailing defendant seeking an award of attorney's fees carries an even heavier burden than a typical litigant trying to prove an abuse of discretion in another context. It is imperative that we use the utmost restraint in awarding attorney's fees to prevailing defendants, lest the award discourage novel or unpopular litigation, stifle attorneys' enthusiasm and creativity, and chill citizens' constitutional right to meaningful access to the courts. See, e.g., Thomas v. Capital Sec. Serv., Inc., 836 F.2d 866, 885 (5th Cir. 1988) (warning that overuse of Rule 11 sanctions may"chill attorney's enthusiasm and stifle the cr eativity of litigants in pursuing novel factual or legal theories"); Thomas D. Rowe, The Legal Theory of Attorney Fee Shifting: A Critical Overview, 1982 Duke L.J. 651, 661 (1982) (ar guing that fee shifting should not "deter good-faith pressing of tenable but not clear-cut claims and defenses, especially those turning on unresolved points of law or, in many instances, genuinely controverted factual disputes"); Eric Y. Yamamoto, Efficiency's Threat to the Value of Accessible Courts for Minorities, 25 HARV. C.R.-C.L. L. REV. 341, 429

n.180 (1990) (arguing that the Supreme Court "curbed the [Civil Rights Attorney's Fees Awar ds] Act's impact on access [to the courts] by authorizing payment of fees to prevailing defendants where the plaintiff 's claim is `unreasonable' even though not made in bad faith"). Because of these concerns, awards of attorney's fees to prevailing defendants should be made sparingly and in only the most egr egious cases. In my view, the present case does not meet this stringent standard.

In contrast to the Majority, I believe that the District Court's factual findings are sufficient to meet the legal threshold for allegations of racial animus on the part of the neighborhood association and the six neighbors (Ina Asher, Steven Asher, Nancy Herman, Walter Herman, Robert Marmon and Toby Marmon), all of whom are Caucasian. See Appellee's Br. at 4, 6. With r espect to the association, the District Court noted that during a Commissioner's meeting, Robert Marmon, one of the association's creators, coordinators, and spokespersons, made racially disparaging remarks about the Barnes Foundation. Specifically, Mr. Marmon repeatedly referred to the Foundation's members as "Mr. Glanton and his people," a paradigmatic reference to African-Americans, and then called them "carpetbaggers" and "outsiders." Given Mr. Marmon's leadership role, it was reasonable to believe that his racial animus r epresented the views of the association. Additionally, the neighbor hood association's lack of opposition to other institutions with parking and traffic needs similar to the Bar nes Foundation further evidences a racially discriminatory motive.

Other facts in evidence also support the Foundation's allegations. For example, the District Court noted the affidavit of Thomas Massaro, a land use consultant, who opined that the neighbors were so irrationally and firmly opposed to the Foundation's proposal that it suggested their concerns were a pretext for racial prejudice. These attitudes could also suggest the same to the Foundation and the District Court. The Foundation also noted in its complaint that, along with other persons, appellants Ina Asher, Walter Herman, Robert Mar mon, and Toby Marmon congregated and picketed outside the Foundation during its opening gala event. Several of the picketers wer e observed

29

holding signs that read, "From LA to P A, Money Buys Justice" and "Lincoln University--Go Home." Mr. and Mrs. Marmon stood in the midst of traffic flow with their video cameras, shining the camera's lights into the cars pulling in for the opening event. Even if the defendants wer e not personally holding the racially derogatory signs, they protested alongside others who were. This provided the Foundation with a reasonable inference that the defendants sought to promote a message charged with racial overtones. Far from arbitrary or fanciful, these facts, which are undisputed, suggest the District Court had a r easonable basis for holding that the Foundation's allegations of racial animus were not factually groundless.

I fear that the Majority affords too little attention to our long-standing principles governing the abuse of discretion standard and too easily discounts the findings of racial hostility. Today, racially motivated conduct is rarely blatant and easily discernible. Persons acting with racial animus have become more sophisticated in disguising their motivations. Although discrimination cases rar ely contain an evidentiary "smoking gun," this does not mean that racial animosity does not exist. As we earlier explained,

> [a]nti-discrimination laws and lawsuits have `educated' would-be violators such that extreme manifestations of discrimination are thankfully rare. The sophisticated would-be violator has made our job a little mor e difficult. Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and `a plaintiff 's ability to pr ove discrimination indirectly, circumstantially, must not be crippled . . . because of crabbed notions of relevance or excessive mistrust of juries.'

Aman v. Cort Furniture Rental Corp. , 85 F.3d 1074, 1081-82 (3d Cir. 1996) (citing Riordan v. Kempiners, 831 F.2d 690, 697 (7th Cir. 1987)). In light of this r eality, I believe the District Court's reliance on circumstantial evidence and its conclusion that the Barnes's claims had at least the threshold quantum of factual support was r easonable and well within its discretion.

Finally, I also disagree with the Majority's r eversal of the neighbors' bad faith claim. The Majority reverses the bad faith claim because the District Court made no mention of this argument. Thus, the Majority concluded that it "was not able to say that the district court rejected [it]." Maj. Op. at 25. In reversing the bad faith claim, the Majority cites Gunter v. Ridgewood Energy Corp., 223 F .3d 190, 196–97 (3d Cir. 2000), wherein we stated that a District Court must explain its reasoning and application of the fee-awards jurisprudence to allow adequate review by an appellate court. However, we have also assumed that a District Court has considered or weighed an argument, even when it has failed to discuss the argument in its decision. See Acosta v. Honda Motor Co., Ltd., 717 F.2d 828, 844 (3d Cir. 1987) (assuming that the District Court weighed the amount of plaintiff 's recovery as a factor in a fee award even though the District Court did not state that it was doing so). Therefore, the District Court's failur e to discuss the bad faith claim does not necessarily imply that it overlooked or ignored it.

In summation, jurisprudence has reposed in the District Court great discretionary power in fee cases. We must respect it. For these reasons, I str enuously dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

31