RENDERED: FEBRUARY 9, 2024; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1283-MR

DAVID RAMLER                                                          APPELLANT

APPEAL FROM CAMPBELL CIRCUIT COURT
v.            HONORABLE DANIEL J. ZALLA, JUDGE
ACTION NO. 18-CI-01009

WILLIAM BIRKENHAUER AND
STEVEN FRANZEN                                                        APPELLEES

OPINION AFFIRMING IN PART
AND REVERSING IN PART

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; CALDWELL AND EASTON, JUDGES.

EASTON, JUDGE: William Birkenhauer ("Birkenhauer") and Steven Franzen ("Franzen") (collectively "Appellees") filed a complaint alleging defamation and "false light" claims against Appellant David Ramler ("Ramler"). Birkenhauer is the Chief of Police of the City of Highland Heights. Franzen is a "legal advisor," like a city attorney, for Highland Heights. Franzen also holds elective office as the Campbell County Attorney. Highland Heights is a city within Campbell County.

The positions of Birkenhauer and Franzen with Highland Heights are appointed. Ramler was previously an elected city councilmember for Highland Heights.

The Appellees' claims arise from pamphlets authored by Ramler and distributed by him to the citizens of Highland Heights as part of his unsuccessful campaign for mayor of Highland Heights. In these pamphlets, Ramler referred to the Appellees as racist and sexist.[1] Ramler filed a counterclaim, including a claim for abuse of process, which was dismissed by the circuit court prior to trial.

At the conclusion of all evidence at the jury trial, Ramler made a renewed motion for a directed verdict, which was denied by the circuit court, and the case was submitted to the jury. The jury awarded Birkenhauer $100,000 in compensatory damages and $100,000 in punitive damages and awarded Franzen $1 in compensatory damages and $100,000 in punitive damages. The punitive damages awarded were one-fifth of what was demanded by the Appellees. Ramler then moved for a judgment notwithstanding the jury's verdict. This motion was also denied. Ramler appealed, asking this Court to vacate the Judgment based on the jury's verdict and to reverse the circuit court's order dismissing Ramler's abuse of process counterclaim.

---

[1] Originally, the Appellees complained of additional statements but decided to take to trial only these two assertions.

Upon our review, we conclude the circuit court erred in denying Ramler's motion for directed verdict and should have granted summary judgment dismissing the Complaint. Ramler's opinion statements regarding the Appellees were non-actionable in the undisputed circumstances presented. The Judgment based upon the claims made because of those statements is reversed with direction to dismiss the Complaint. We agree that the circuit court properly dismissed Ramler's abuse of process counterclaim and affirm that decision.

**FACTUAL AND PROCEDURAL HISTORY**

Ramler was elected to serve on the Highland Heights City Council in 2014. Ramler had lived in the Harriet Avenue neighborhood of Highland Heights and so he was familiar with it. This neighborhood is near the campus of Northern Kentucky University ("NKU"). Because of this proximity, NKU students rent apartments or houses in this area. During the school year, there could be issues with how students maintained the properties. In a college community, there were (not surprisingly) parties leading to public disturbance or noise complaints.

Because of constituent complaints, Ramler went out to this area to observe behavior of the residents and the police when they were called to the scene. Ramler supposedly even went up to people to question them about what they were doing and talked with the police officers. This made Ramler a thorn in

the side of Birkenhauer.  Birkenhauer wanted a meeting to "get Dave Ramler under control."

The plan was to have a conversation about these issues before a city council meeting on September 5, 2017.  Before the city council meeting on that date, another meeting took place.  Mayor Greg Meyers ("Meyers") sat at the head of a table.  To one side sat Franzen and Birkenhauer.  On the other side sat Ramler and Councilmember Debbie Ball ("Ball").  Franzen and Ramler were facing each other across the table.  Birkenhauer and Ball sat across from each other.  Ramler later explained that he and Ball were members of a safety committee of the city council.  Ramler refers to this interaction as a meeting of the safety committee, while the Appellees refer to it as a "so-called" meeting.[2]

Franzen warned Ramler that his presence at police scenes could escalate situations and lead to someone being hurt.  Franzen warned that the danger of an escalated situation due to Ramler's appearances at police scenes could cause unwanted protestors "like Black Lives Matter" to come to Highland Heights.  Ramler noted the way Franzen said the phrase "Black Lives Matter."  Shortly after

[2] It is not clear if the safety committee keeps minutes of its meetings.  If so, there are no minutes in the record.  The Appellees apparently did not consider this an "official" committee meeting.  The circuit court granted Appellees' motion *in limine* to preclude Ramler from introducing evidence that the safety committee meeting violated the Open Meetings Act.  If it was a meeting of that committee, it was subject to the legal requirements of notice to the public.  *See* Kentucky Revised Statute ("KRS") 61.805(2).  We can only wonder what might have been said or not said if the public had been invited to observe the meeting.

the meeting, Franzen apologized to Ramler for his tone. Franzen did not apologize to Ball for his tone. Franzen would later explain that he was not directing his comments during the meeting toward Ball. Franzen said he wished he would have had the opportunity to speak with Ramler in private.

Ramler stopped showing up at police scenes on Harriet Avenue. A year later, Ramler decided to run for mayor of Highland Heights in the 2018 election. He ran primarily to address the alleged lack of enforcement of ordinance violations on Harriet Avenue. In October 2018, Ramler published a six-page pamphlet to outline his platform. Ramler distributed around 1,200 pamphlets around town. The content of the pamphlet no doubt also made its way to the ever present internet.

Ramler's pamphlet states there is "racism, sexism, discrimination toward our residents by city attorney [Franzen], police chief [Birkenhauer], and mayor [Meyers]." The pamphlet describes Ramler's recollection of the events that took place at the meeting on September 5, 2017. Ramler states the meeting was started by Birkenhauer and immediately turned over to Franzen. The pamphlet describes Franzen's behavior at the meeting as "very unprofessional, yelling with anger and hatred at council members Ball and [Ramler]." It then goes on to say Franzen told Ramler and Ball they "interfered with police business and that an officer could be shot."

The pamphlet states the "real reason" Birkenhauer and Franzen would not resolve the problems on Harriet Avenue was because "[t]here are black as well [as] white students and athletes living on Harriet Ave." According to Ramler, Birkenhauer and Franzen "singled out and grouped all black students at NKU and judged them as a group not as individuals[.]" Ramler accuses Franzen and Birkenhauer of saying the reason they have chosen not to enforce issues on Harriet Avenue is "because they did not want any marches or protest[s] from . . . groups 'like BLACK LIVES MATTER.'" In Ramler's view, since Birkenhauer and Meyers did not correct this comment, they supported it. Ramler writes that Franzen's statement about Black Lives Matter "is a very hateful and racist statement and not acceptable coming from police chief and city attorney and county attorney."

Ramler's pamphlet then discusses the aftermath of the meeting. Ramler acknowledges that Franzen apologized to Ramler privately for the way Franzen talked to him (but did not apologize for the agenda of the meeting). Ramler states Franzen did not apologize to Ball, "demonstrating sexism toward her."

Ramler lost the 2018 mayoral election to incumbent Meyers by a more than two-to-one margin.[3]  Right after that election day in 2018, Franzen and Birkenhauer (but not Meyers) filed the Complaint against Ramler for defamation and false light based upon the contents of Ramler's pamphlet.

Before his Answer was due, Ramler solicited a settlement offer from Franzen and Birkenhauer.  In response, Franzen and Birkenhauer tendered an "Abeyance and Settlement Agreement" to Ramler.  This proposed settlement agreement called for Ramler to issue an apology letter to the Appellees, retracting his statements in the pamphlet.  Another provision of the settlement agreement called for Ramler to sell his home in Highland Heights and remain outside Campbell County for at least forty years.  Ramler rejected the Appellees' settlement offer.

After settlement negotiations failed, Ramler filed his original Answer, Affirmative Defenses and Counterclaims.  Appellees filed a Motion to Dismiss, For More Definitive Statement and Sanctions.  The circuit court granted leave for Ramler to file an amended pleading, paring down his counterclaims.  Ramler pled that the Appellees' settlement offer calling for Ramler to move out of the county for forty years was evidence of the Appellees' attempt to punish him and to

---

[3] Taking judicial notice pursuant to Kentucky Rule of Evidence ("KRE") 201, official results of the Kentucky State Board of Elections show Meyers with 1,091 votes (69.14%) to Ramler with 487 votes (30.86%).

prevent future political challenges from him. This was the basis for the abuse of process claim. The Appellees renewed their request for dismissal.

By Order entered on October 4, 2019, the circuit court dismissed Ramler's abuse of process counterclaim. The circuit court held that the Appellees' settlement offer "was not an improper use of the legal process and was not a method of extortion, a threat, or a club." Although Ramler had made claims other than for abuse of process, that is the only claim for which he seeks review on this appeal.

Ramler filed a Motion to Change Venue. Ramler's argument was that he would not receive a fair trial in Campbell County because Birkenhauer was Chief of Police of the City of Highland Heights and Franzen was both the legal advisor for Highland Heights and the elected Campbell County Attorney. Ramler also noted Franzen publicly supported the presiding circuit judge, who had been elected to fill an unexpired term during the same 2018 election.[4] The circuit court denied Ramler's Motion to Change Venue.[5]

---

[4] Kentucky Board of Elections data also confirms the presiding judge's election in a contested race in 2018.

[5] We find no error in this decision by the circuit court. Judges in Kentucky are elected. The fact that an attorney or party supported a successful candidate for judge does not automatically require disqualification. *See Dean v. Bondurant*, 193 S.W.3d 744, 748 (Ky. 2006). Also, changes of venue are usually not appropriate until an effort has been made to seat a jury in the proper venue. *See Hubers v. Commonwealth*, 617 S.W.3d 750, 777 (Ky. 2020). There was no substantial difficulty seating a jury composed of jurors with proper indifference to who the parties were in this case.

In late 2020, the Appellees filed a Partial Motion for Summary Judgment on liability asserting they were entitled to judgment as a matter of law on all their claims, and the only element left to be determined was that of damages. Ramler filed an opposing Motion for Summary Judgment. Ramler's main argument was that the statements contained in his pamphlet were statements of opinion which cannot be proven as true or false and thus are not actionable.

The circuit court denied both motions for summary judgment. The circuit court ruled Ramler's opinions that the Appellees are "racist" and "sexist" implied facts that are provable as false. The circuit court stated Ramler's opinions about the Appellees implied they "have engaged in conduct that would lead one to believe that they are racist or sexist." The circuit court added Ramler's opinions "could be construed as defamatory if the facts implied are not true."

Before trial, Ramler was granted leave to file a motion to dismiss the case pursuant to the Uniform Public Expression Protection Act ("UPEPA").[6] KRS 454.460 *et seq*. This law provides protection from liability for statements made about a matter of public concern and allows expedited relief in cases alleging

---

[6] In 2022, Kentucky became only the third state (joining Washington and Hawaii) to adopt UPEPA.

liability for such statements. The circuit court correctly denied Ramler's UPEPA motion. That law was not expressly made retroactive.[7]

On July 13, 2022, the three-day jury trial commenced. Franzen, Ramler, Birkenhauer, and Ball were the only witnesses called. For completeness, we will summarize the testimony in some detail.

Franzen was the first witness. He testified that he has been the legal advisor to the City of Highland Heights for 35 years and Campbell County Attorney since 2010. Franzen has known Birkenhauer on a professional basis for decades. Franzen first became familiar with Ramler when Ramler attended several city council meetings before his election to the council. Ramler's complaints at these meetings were about the noise on Harriet Avenue, as well as disturbances relating to the adjacent soccer field on NKU's campus.

Franzen testified Birkenhauer asked him to intervene because Ramler was repeatedly "interfering with police work" after being elected to the city council. Birkenhauer complained to Franzen about Ramler's allegedly showing up at police scenes on Harriet Avenue and antagonizing the student residents on the street. Franzen testified Ramler would try to tell officers at the scenes who to arrest. Franzen stated that Ramler's "inject[ing] himself into an active scene" was inappropriate as a councilmember.

_____

[7] KRS 446.080(3).

-10-

Franzen set up the meeting with Ramler and Birkenhauer to be held prior to a regularly scheduled city council meeting. Franzen planned to address Birkenhauer's concerns with Ramler. Franzen stated he anticipated only Ramler to show up; instead, Meyers and Ball were also present. Franzen warned Ramler that his presence at police scenes could lead to a lawsuit or someone being hurt.

Franzen testified he advised Ramler he did not want "protestors coming into our city because somebody's been hurt." Franzen gave Black Lives Matter as an example. He wanted Ramler to take the situation seriously. He did not intend to indicate any racial animosity with the example given. Franzen stated he would not want any protestor group coming to Highland Heights. Franzen testified his concern was due to protests such as the ones in Ferguson, Missouri.[8] Franzen had heard a presentation at a prosecutors' conference and remembered how "agitators" and others "causing trouble" were involved in that situation.

Franzen testified he did virtually all the talking at the meeting and addressed all his comments directly to Ramler. According to Franzen, he never addressed Ball at any point during the meeting. Franzen testified Ramler became defensive during the meeting. Sometime after the meeting, Franzen apologized to Ramler for his tone and stated he wished he could have spoken to Ramler one-on-

---

[8] A series of events occurred in Ferguson, Missouri, after a white police officer, Darren Wilson, shot and killed an 18-year-old black man, Michael Brown, in August 2014.

-11-

one rather than in front of others. Franzen testified he did not apologize to Ball as he did not address her during the meeting. Franzen remembered that he and Ramler were cordial with each other following the meeting, and that Ramler stopped showing up at police scenes on Harriet Avenue.

Franzen believes he was defamed because of Ramler's ambitions to become mayor. Franzen stated he sought to "punish" Ramler. Franzen also filed the defamation lawsuit to remove the "stain" from his reputation. Franzen characterized the contents of Ramler's pamphlet as "insulting." Franzen was worried about the hypothetical scenario of a terminated employee potentially claiming racism or sexism on his part due to the contents of Ramler's pamphlet. When asked how he arrived at claiming $1.00 in compensatory damages and $500,000.00 in punitive damages, Franzen replied he did not know, but that his intent behind pleading a big number was to make an impression on Ramler and "others who wanted to speak lies about people."

When cross-examining Franzen, Ramler's counsel attempted to introduce into evidence the proposed settlement agreement from the Appellees in which they offered to drop the lawsuit if Ramler sold his Highland Heights home and moved outside Campbell County for a period of forty years. Ramler's counsel offered this to show the level of Franzen's negative feelings against Ramler as an element of his credibility, despite the evidence being subject to the general

-12-

prohibition of introducing evidence about settlement negotiations.[9]  The circuit court excluded this evidence.

The Appellees then called Ramler as a witness.  Ramler testified regarding what transpired during the meeting, as well as the contents of his election pamphlet.  Ramler stated the Appellees' actions toward him and Ball during and after the meeting were the sole basis for his claims of racism and sexism on the part of the Appellees.  Ramler believed Birkenhauer to have the same beliefs as Franzen as Birkenhauer did not admonish Franzen for the comments but instead showed silent agreement with Franzen's comments and behavior.  Ramler believed Franzen to be sexist as he did not apologize to Ball.  Ramler testified he believed at the time of publishing, and continued to believe at trial, that the Appellees acted in a racist and sexist manner.

Birkenhauer also wanted to "punish" Ramler.  He wanted "consequences" for Ramler's statements.  Birkenhauer stated he would have been fired if Ramler won the mayoral election, and that the allegations of racism and sexism would hinder Birkenhauer from finding a new job.  Birkenhauer occasionally serves as an expert witness in other cases, and he complained the allegations could prevent him from serving as an expert witness in the future.

---

[9] KRE 408.

Birkenhauer has remained the Chief of Police since the publishing of Ramler's pamphlet.

Ball testified that she was "talked down to," "demeaned," and "put in her place" by Franzen at the meeting. Ball remembered a prior occasion when she first joined the city council. Ball believed Franzen talked down to her then too, and she instructed him then never to do that again. Unlike Ramler, Ball did not receive an apology from Franzen. Ramler informed Ball of his apology from Franzen. Ball testified she then sent an email to Franzen, Birkenhauer, and Meyers asking for an apology such as the one Ramler received. She specifically asked if she was unworthy of an apology because she was a woman. She received no response, much less any apology. Ball also believed that the Appellees' conduct at the meeting was racist as well.

At the end of the Appellees' case and once again after the close of all evidence, Ramler moved for a directed verdict. Both motions were denied. Ramler's post-trial motion for judgment notwithstanding the verdict was also denied. This appeal followed.

**STANDARD OF REVIEW**

A circuit court considering a motion for directed verdict "must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion." *Belt v. Cincinnati Ins. Co.*, 664 S.W.3d 524, 530 (Ky. 2022) (citation

-14-

omitted). The circuit court should grant a directed verdict only when "there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Id.* (citation omitted). Upon review, this Court will reverse the circuit court's ruling only if we find that the jury could not have "reasonably reached its verdict on the basis of the evidence before it." *Id.* (citation omitted). "In reviewing a trial court's decision to deny a motion for a judgment notwithstanding the verdict, we apply the same standard of review that we use when reviewing a lower court's decision to deny a motion for a directed verdict." *Louisville and Jefferson Cnty. Metro. Sewer Dist. v. T+C Contracting Inc.*, 570 S.W.3d 551, 576 (Ky. 2018) (internal quotation marks and citation omitted).

But application of this standard for directed verdict of course assumes there is a matter for the jury to properly determine as a question of fact. As we will explain, there was no viable claim to submit to the jury. The Complaint should have been dismissed by summary judgment, despite the stringent standard for such motions. The same may be said for the counterclaim for abuse of process.

## ANALYSIS

The seminal case of *New York Times Company v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964), prohibits a public official from recovering damages for defamatory statements relating to his or her official

conduct, unless he or she can prove that "the statement was made with 'actual malice' – that is, with knowledge that it was false or with reckless disregard of whether it was false or not." Actual malice must be shown by clear and convincing evidence. *Welch v. Am. Publ'g Co. of Kentucky*, 3 S.W.3d 724, 728 (Ky. 1999). As for the tort of false light, the actual malice standard must also be met for a plaintiff to prevail at trial when the subject matter of the speech is of public interest. *Cromity v. Meiners*, 494 S.W.3d 499, 505 (Ky. App. 2015). As we shall see, opinions are not false statements of fact which may be a basis for defamation under these standards.

The traditional elements of a defamation claim are: (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281-82 (Ky. 2014) (citing RESTATEMENT (SECOND) OF TORTS § 558). This last element ties into the proof of damages necessary to demonstrate an injury to reputation:

> Generally, defamatory words written or spoken of another are divided into two classes in determining the extent to which they are actionable. Words may be actionable per se, or per quod. In the former class, damages are presumed and the person defamed may recover without allegation or proof of special damages.

> In the latter class, recovery may be sustained only upon an allegation and proof of special damages.

*Hill v. Evan*s, 258 S.W.2d 917, 918 (Ky. 1953).

In other words, defamatory statements are actionable per se "when there is a conclusive presumption of both malice and damage." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004), *overruled on other grounds by Toler*, 458 S.W.3d 276 (citation omitted). Thus, when the language at issue is determined to be defamatory per se, recovery is permitted without proof of special damages, because injury to plaintiff's reputation is presumed and the words are "actionable on their face – without proof of extrinsic facts or explicatory circumstances." *Id.* (citation omitted).

"Special damages are those beyond mere embarrassment which support actual economic loss[.]" *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 274 (Ky. App. 1981). In contrast to defamation per se, defamation per quod is actionable only when the defamed person alleges and proves special damages. *Hill*, *supra*, at 918. In the present case, the claim as pled was for defamation per quod.[10] The Appellees claimed specific elements of damages in their Complaint.

---

[10] At oral argument, counsel for the Appellees conceded that the pleadings alleged defamation per quod, but counsel argued that the final judgment essentially amended the pleadings to the evidence (or rather lack of evidence) regarding damages pursuant to Kentucky Rules of Civil Procedure ("CR") 15.02. Because damages are a secondary issue in this case, we choose not to comment further on this questionable excuse for the failure to plead defamation per se. Based on the pleadings, Ramler would have prepared for evidence of actual damages, which was not

-17-

In *New York Times*, *supra*, at 256, 84 S. Ct. at 710, the United States Supreme Court decided for the first time the extent to which the First Amendment limits the government, specifically the courts, from awarding damages in defamation cases to public officials against their critics. As previously mentioned, *New York Times* requires a public official plaintiff to prove actual malice on the part of the speaker of the defamatory statement. And ever since this ruling, American courts have striven to strike the balance between the constitutional right to free speech toward a public official in matters of public concern and the common law right to seek recovery for damage to reputation due to a false factual statement.

Ramler argues his pamphlet is "pure opinion," which is absolutely protected speech. In *Yancey v. Hamilton*, 786 S.W.2d 854 (Ky. 1989), the Kentucky Supreme Court adopted the RESTATEMENT (SECOND) OF TORTS' approach to opinion-based defamation claims. Pure opinion "occurs when the maker of the comment states the facts on which he bases his opinion of the plaintiff and then expresses a comment as to the plaintiff's conduct, qualifications or character." RESTATEMENT (SECOND) OF TORTS § 566 cmt. b. A statement consisting of pure opinion is absolutely protected. *Yancey*, *supra*, at 857. *See also*

---

forthcoming, and then, using CR 15.02, the whole nature of the defamation alleged would have been changed after the failure to produce required evidence for defamation per quod.

-18-

*Doe 1 v. Flores*, 661 S.W.3d 1, 7-8 (Ky. App. 2022) (comments made about the behavior of Covington Catholic students observed at a protest in Washington DC were not actionable because they were opinions).

The other type of opinion, the mixed type, "is one which, while an opinion in form or context, is apparently based on facts regarding the plaintiff or his conduct that have not been stated by the defendant or assumed to exist by the parties to the communication." RESTATEMENT (SECOND) OF TORTS § 566 cmt. b. A mixed opinion may open a defendant to liability if a listener draws a reasonable inference that the defendant's opinion must have been based on undisclosed defamatory facts. *Yancey*, *supra*, at 857.

Soon after *Yancey*, the United States Supreme Court examined the relationship between opinion and fact in defamation claims in *Milkovich v. Lorain Journal Company*, 497 U.S. 1, 110 S .Ct. 2695, 11 L. Ed. 2d 1 (1990). The Court concluded a statement on matters of public concern must be sufficiently factual so that it may be proven false, or the statement must imply underlying facts which are provable as false before there can be liability under state defamation law. *Id.* at 21, 110 S. Ct. at 2707. When reaching its decision, the Court provided the following analogy:

> If a speaker says, "In my opinion John Jones is a liar," he
> implies a knowledge of facts which lead to the
> conclusion that Jones told an untruth. Even if the speaker
> states the facts upon which he bases his opinion, if those

-19-

> facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 18-19, 110 S. Ct. at 2705.

In *Cromity*, *supra*, at 501, a police officer brought a defamation claim against a radio program host arising out of statements made by the host after the officer cited him for speeding, including calling the officer an "out and out liar," a "troubled public servant," and "delusional." The Kentucky Supreme Court found the radio host's statements addressed an issue of public concern – the integrity of a local police officer. *Id.* at 504. The court ruled that, since the radio host fully disclosed the facts supporting his opinion, and those facts were not provable as false, his opinions were constitutionally protected. *Id.* Conversely, the court reasoned that the radio host's statements alleging the police officer was a liar could have been actionable if the host failed to state the facts in support of his opinion, failed to give a complete rendering of the facts, or gave facts that were provable as false. *Id.* at 503.

Ramler's pamphlet fully disclosed the facts supporting his opinion regarding the Appellees, and those facts were not provable as false. The pamphlet outlined the events that took place during, and immediately after, the meeting. The

pamphlet explicitly disclosed the factual reasons behind Ramler's assertions of racism and sexism on part of the Appellees. Ramler opined the Appellees were racist due to the Black Lives Matter statement, and he believed the Appellees were sexist due to a lack of an apology to a female member of the city council.

The parties agree that the events surrounding the meeting is the sole basis for Ramler's claims of racism and sexism. There are no allegations that Ramler omitted any material facts about the meeting from the pamphlet. There were no substantial arguments about the events and who said what. We conclude the contents of Ramler's pamphlet were pure opinion pursuant to *Cromity*, and thus the Appellees' case should have been dismissed before presenting it to a jury.

Ramler also argues his pamphlet is nonactionable rhetorical hyperbole. Separate from opinions, statements considered "rhetorical hyperbole," "vigorous epithet," and "loose, figurative, or hyperbolic language" are provided constitutional protection. *Nat'l College of Kentucky, Inc. v. WAVE Holdings, LLC*, 536 S.W.3d 218, 223 (Ky. App. 2017). The Kentucky Supreme Court analyzed this issue in *Welch v. American Publishing Company of Kentucky*, 3 S.W.3d 724 (Ky. 1999). In *Welch*, an incumbent mayor sought re-election. *Id.* at 726. Supporters of the incumbent's challenger ran an advertisement in the local paper. *Id.* This advertisement included the following statements about the incumbent: "The City is Broke Because of His Management," "Employees Have Been Paid

Almost $100,000 because of Political Firings," and "Frog Has Squandered Over 1½ Million Dollars of Surplus [City] Money." *Id.* The incumbent sued the supporters of his challenger, as well as the newspaper that ran the advertisement, for defamation and false light. *Id.* The circuit court granted summary judgment to the defendants. *Id.*

The court in *Welch* characterized many of the contested phrases in the advertisement as being figurative, and that they employed rhetorical exaggeration to accomplish their intended purpose of casting a political candidate in a negative light. *Id.* at 730. The court found such language unactionable. "This type of generalized rhetoric bandied about in a political campaign is not the language upon which a defamation lawsuit should be based, but instead is political opinion solidly protected by the First Amendment." *Id.* The court cautioned their ruling "should not be interpreted as condoning political advertising which appears to have no purpose other than to sully the reputation of a candidate." *Id.* However, the court determined the evidence on record was insufficient to create an issue of fact for a jury to consider. *Id.*

Ramler's statements also constitute "rhetoric bandied about in a political campaign." Ramler's statements were used in an election pamphlet as part of his campaign for mayor. The pamphlet's intended purpose was to cast

incumbent Meyers and the city's appointed employees in a negative light (which was ultimately unsuccessful as Meyers easily won re-election).

Courts outside Kentucky have generally recognized that statements labeling another person as "racist" are rhetorical hyperbole. In *Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988), an elementary school principal filed suit against the president of the school's parent teacher association for calling the principal "racist." The principal had contended that the epithet "racist" was itself actionable because it marked her as unfit for her job. *Id.* at 401. The Seventh Circuit held the statement of the president of the parent teacher association calling the principal "racist" was not defamatory. *Id.* The court added: "In daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face[.]" *Id.* at 402. The court found the statement calling the principal a "racist" "fit comfortably within the immunity for name-calling." *Id.*

Other jurisdictions have further determined that characterizing someone as "racist" is not actionable. *See Garrard v. Charleston Cnty. School District*, 838 S.E.2d 698 (S.C. Ct. App. 2019), *aff'd in part & vacated in part by* 890 S.E.2d 567 (S.C. 2023) (ruling statements in a newspaper editorial characterizing a local high school football coach and several of his players as "racist douchebags" were not actionable because they were expressions of opinion and rhetorical hyperbole); *Silverman v. Daily News, L.P.*, 129 A.D.3d 1054 (N.Y.

App. Div. 2015) (ruling newspaper's report that plaintiff authored "racist writings" was a statement of opinion, with full disclosure of the facts supporting the opinion); *Meissner v. Bradford*, 156 So.3d 129, 131 (La. Ct. App. 2014) (ruling statement made by a commissioner in a youth football league that the league's former president "has a problem with people of color" was a statement of opinion in the nature of hyperbole); *Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994) (ruling defendant's statement that plaintiffs "hate Jews" constituted nonactionable name-calling).

Whether an offensive statement is couched as opinion or rhetorical hyperbole, we recognize opinions are like . . . feet. Almost everybody has a couple, and some of them stink. We will take a moment to show how easy it can be to say something which can lead to a perhaps unfair but nonetheless unactionable opinion.

In his testimony, Franzen referred to the events in Ferguson, Missouri, and used words to describe people as "making trouble" and "agitating." This same wording was used to describe those "outsiders" who fought against segregation in the infamous Southern Manifesto of 1956. The document was entitled a Declaration of Constitutional Principles. It decried "agitators and troublemakers

-24-

invading our States."[11]  To their credit, no senator or representative from Kentucky signed the document.

One could argue that use of this wording implies that the speaker is a racist.  This is the use of a single statement to label a person.  Many in our society today are weary of others permanently labeling others with reference to isolated statements or events.  Yet such labeling is an opinion based upon the fact of the statement being made.  It is not actionable as defamation.

The testimonies of the Appellees lend support to the notion that racism is hard to define as an opinion much less as a matter of fact.  Franzen testified, "I don't think that there's anybody in the country that's not a racist on Mr. Ramler's definition."  Birkenhauer similarly testified "by Mr. Ramler's definition [racism] could be anything."  When asked if he had ever told a racist joke, Birkenhauer said that it "depends on your definition of racist."

At the oral argument for this case, the Court asked the Appellees' counsel to define the word "racism."  Counsel replied essentially that racism was judgment of a person based on the color of their skin.  The Merriam-Webster dictionary lists three different definitions of "racism."  The first such definition states racism is "a belief that race is a fundamental determinant of human traits and capacities and that racial differences produce an inherent superiority of a

---

[11] Congressional Record, Senate – March 12, 1956, at page 4460.

particular race." Merriam-Webster also lists multiple definitions of the word "race," and none of the definitions narrowly define "race" as simply based on skin color. If the successors of Noah Webster and the Appellees cannot define a "racist," then how can the Appellees prove they are not or Ramler prove they are?

We may engage in a similar discussion about sexism. During the trial, an attorney for one of the Appellees couched questions in terms of how something made the witness feel "as a man." But defamation does not discriminate based on gender. At one point, Franzen explained one of the reasons he wanted to punish Ramler was because Ramler was "not man enough" to make the statements to Franzen's face. Surely, there was no intent to suggest that women are subject to a different standard when it comes to the courtesy of initiating difficult but appropriate confrontations, rather than speaking about someone behind his or her back.

Again, someone could use the fact that such statements were made to form an opinion about sexism of the speaker. It would not necessarily be an accurate or even fair opinion. Still, it is an opinion and is not actionable as a factual mistruth under defamation law.

One of the prospective jurors understood the problem with this case. He said he did not like politicians. He thought this was a case of two politicians "duking it out." He wondered that if politicians could sue each other for the things

they say about each other these days, why were there not a lot more suits, and he gave an example of numerous comments by a well-known national politician. This juror was struck for cause. As it turns out, he got it. The First Amendment simply does not allow lawsuits over every hostile thing a politician says.

Moving past the insufficient status of Ramler's opinions as defamation, Ramler also argues Appellees failed to introduce any evidence that they suffered special damages from Ramler's speech. The Appellees argue that Ramler's statements constitute defamation per se because they exposed the Appellees to public hatred, ridicule, contempt, or disgrace. Thus, recovery is permitted without proof of special damages because injury to plaintiffs' reputation is conclusively presumed.

We disagree. A jury cannot be "permitted to presume damages without proof of injury[.]" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352, 94 S. Ct. 2997, 3013, 41 L. Ed. 2d 789 (1974). "As with any defamation claim against a public official, [a plaintiff] must establish that statements have been made that hold him up to public hatred, contempt or ridicule, or that caused him to be shunned or avoided, or that injured him in his business or occupation; that the statements are false; and that the statements were made with actual malice." *Doe v. Coleman*, 497 S.W.3d 740, 749 (Ky. 2016).

In this case, neither Appellee showed that Ramler's statements subjected them to public hatred, contempt, or ridicule. No witness was called to establish this in the local community. Nor could the parties testify the statements caused measurable harm to them. Franzen testified he was worried people in the community would think he is racist or sexist, but he did not detail a specific instance in which a person ridiculed him. Franzen's occupation was also apparently unharmed as he was elected without opposition as county attorney in both 2018 and 2022. He still serves as the legal adviser to the City of Highland Heights.

Birkenhauer also could not testify to specific acts of diminished reputation. Birkenhauer testified he would have been fired if Ramler won the mayoral election, and that the allegations of racism and sexism would hinder him from finding a new job – not that he is looking for one. Birkenhauer also complained the allegations could prevent him from serving as an expert witness in the future. No witness was called to establish Birkenhauer was or would be denied any job he sought. No witness was called to say Birkenhauer's use as a paid expert witness was in fact damaged. The evidence consisted only of Birkenhauer's self-serving statements of concern about this.

The damages claimed are speculative at best, and speculative damages may not be recovered. *Curry v. Bennett*, 301 S.W.3d 502, 506 (Ky. App. 2009). A

plaintiff must prove special damages to establish the element of injury to reputation. *Columbia Sussex Corp., Inc. v. Hay*, *supra*, at 274. The Appellees did not prove special damages, and thus failed to establish their reputation was injured. This discussion about damages is academic anyway because the statements were not actionable as we have explained.

The circuit court should not have let this case go to a jury as there was a complete absence of proof on several elements necessary to sustain a public concern defamation case. "An indispensable principle of free speech guaranteed by the First Amendment to the United States Constitution is 'that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Welch*, *supra*, at 725-26 (quoting *New York Times*, *supra*, at 271, 84 S. Ct. at 721). Political figures often need thick skins when obtaining and holding public office. Sharp criticisms can hurt feelings, but public officials know what they are getting into when elected or appointed to serve the public.

Appellees' false light claims also fail as a matter of law. False light is part of the right to privacy. It can be difficult, although not impossible to apply the claim when the person is a public figure. The Kentucky Supreme Court recognized the cause of action of false light within the tort of invasion of privacy in *McCall v. Courier-Journal and Louisville Times Company*, 623 S.W.2d 882, 887-

88 (Ky. 1981). False light and defamation are closely allied, and an injured party may seek relief through both causes of action, arising out of the same publication, but he is limited to only one recovery. *Id.* False light requires that (1) the false light in which the other was placed would be highly offensive to a reasonable person; and (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed. *Id.* at 888.

The court in *McCall* recognized its past ruling in *Sellers v. Henry*, 329 S.W.2d 214 (Ky. 1959), that if a publication deals with a matter of public interest or public concern, even if it invades a person's privacy, it is not subject to the tort of invasion of privacy. The court in *McCall* did not go so far regarding the specific action of false light. Instead, the court held the defense of public interest should be applicable to false light claims where the published statements are true, but it is not available as a defense in cases of the publication of false statements. 623 S.W.2d at 888.

As previously mentioned, the parties do not dispute the basic underlying facts about what was said or done at the meeting – the disagreement is whether Ramler's opinion based on those facts was defamatory. The Appellees have stated the Black Lives Matter statement was made and that Franzen did not

apologize to Ball.  Since the essential facts behind Ramler's contested opinion statements are true, the Appellees' claim for false light also fails.

As we believe Ramler's statements of opinion were on matters of public concern and Ramler disclosed the underlying facts behind the statements, the Appellees cannot sustain a defamation action.  The circuit court should have granted summary judgment to Ramler as his statements could not be proven to be false at trial.  At the very least, the circuit court should not have let the issue go to a jury.  The jury verdict against Ramler cannot stand and is therefore reversed.

## RAMLER'S ABUSE OF PROCESS COUNTERCLAIM
## STANDARD OF REVIEW

When proceedings on a motion to dismiss include consideration of evidentiary material outside the parameters of the pleadings themselves, the motion often becomes one for summary judgment.  CR 12.02.  In this case, the circuit court did not limit its review just to the pleadings themselves.  Evidentiary materials were in the record and part of the motion to dismiss process.

"The standard of review on appeal of a summary judgment is whether the circuit judge correctly found that there were no issues as to any material fact and that the moving party was entitled to a judgment as a matter of law."  *Pearson ex rel. Trent v. Nat'l Feeding Systems, Inc.*, 90 S.W.3d 46, 49 (Ky. 2002).  Summary judgment is only proper when "it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor."

*Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). In ruling on a motion for summary judgment, the court is required to construe the record "in a light most favorable to the party opposing the motion . . . and all doubts are to be resolved in his favor." *Id.*

## ANALYSIS

Ramler believes his abuse of process counterclaim was the only claim in this case that should have been tried. Ramler asserts the Appellees' settlement offer calling for Ramler to move out of Campbell County for forty years was a textbook example of abuse of process. The counterclaim had more merit than the Complaint, but it still fails as a matter of law.

An abuse of process claim is defined as "the irregular or wrongful employment of a judicial proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citation omitted). The essential elements of this claim are: (1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding. *Id.* "Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even though with bad intentions." *Id.* at 394-95. An ulterior purpose "usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the

surrender of property on the payment of money, by the use of the process as a threat or a club." *Id.* at 395 (citation omitted).

We do not believe the Appellees' settlement offer to Ramler was an abuse of process. They sued to punish Ramler. This was not an improper motive; they wanted and obtained an award of punitive damages. Still, Ramler may have been able to show the first element of an ulterior motive. The Appellees may have wanted not to just punish Ramler with an award of damages but also get rid of him by making him leave the community.

Historically, the tort of abuse of process must relate to some aspect of the process of a suit (seeking an injunction, garnishment, or some other act by the court) to achieve the improper purpose. We hesitate to approve the use of this tort solely on the basis of a settlement offer. Such communications do not involve process which may be issued by the court itself. Other states have similarly cautioned against using settlement discussions as the sole basis for an abuse of process claim. *See Coleman v. Gulf Ins. Group*, 718 P.2d 77 (Cal. 1986). In this case, the Appellees responded to a request from Ramler. The fact that they did so in a preposterous manner does not sustain an abuse of process claim when all the circumstances of this case are considered.

Many may see the banishment demand as outrageous. In an almost Biblical fashion, the Appellees emulate God to cast Ramler, like Moses, into the

wilderness for the required forty years to achieve redemption. Kentucky does not allow such a punishment of banishment, even for criminals. *Weigand v. Commonwealth*, 397 S.W.2d 780, 781 (Ky. 1965).

Still, the Appellees filed a lawsuit which, if meritorious, could properly seek to "punish" Ramler. They tendered a settlement offer only when requested by Ramler. The filing of the lawsuit and the settlement offer were in the natural course of litigation. The settlement negotiations did not actually involve "process" to be issued by the court. Summary judgment dismissing the abuse of process claim was proper.

## CONCLUSION

The Appellees' counsel challenged us to have the "courage" to create a right for public officials to sue those who express opinions about them even though based on factual observations. We instead find courage to uphold the freedom enshrined in our Constitution. It is no accident that freedom of political speech is protected by the First Amendment to the Constitution. That freedom was particularly important to the founders who, if they had lost their battle for freedom, could have been executed by a king for criticizing him.

In numbered paragraph 17 of his unsuccessful motion for a change of venue, Ramler said: "This is a political case, involving political rivals, which should have properly ended at the ballot boxes in November." Indeed. Statements

made during a campaign for elective office are at the pinnacle of the protection of the First Amendment. Ramler's opinions about racism and sexism are just that – opinions. He stated the basis for them. He cannot be found liable for defamation for these opinions.

The Judgment of the Campbell Circuit Court in favor of the Appellees is REVERSED with direction to dismiss the Complaint. The Campbell Circuit Court's dismissal of the abuse of process counterclaim is AFFIRMED.

ALL CONCUR.

BRIEFS AND ORAL ARGUMENT
FOR APPELLANT:

Michael Abate
William R. Adams
Louisville, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEES:

Nick Alig
John Alig
Wilder, Kentucky